**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GABOR RONA and LISA DAVIS,<br><br>           Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF STATE; MARCO A. RUBIO, in his official capacity as Secretary of State; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT K. H. BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in her official capacity as United States Attorney General; OFFICE OF FOREIGN ASSETS CONTROL; and LISA M. PALLUCONI, in her official capacity as Acting Director of the Office of Foreign Assets Control,<br><br>           Defendants. | Civil Action No. 25-3114 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

    I.      The International Criminal Court.......................................................................... 2

    II.     Executive Orders 13,928 (2020) and 14,203 (2025)...............................................8

    III.    Plaintiffs' Interactions with the ICC .....................................................................12

ARGUMENT ...................................................................................................................... 15

    I.      Plaintiffs Are Likely to Succeed on the Merits.....................................................15

          A.      EO 14,203 Violates the First Amendment. ................................................16

          B.      EO 14,203 Is Unconstitutionally Vague. ...................................................21

          C.      EO 14,203 Is Ultra Vires Under IEEPA. ...................................................25

    II.     EO 14,203 Is Causing Irreparable Harm................................................................26

    III.    The Balance of the Equities and Public Interest Favor Relief. .............................27

CONCLUSION.................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*Agudath Isr. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) .................................................................. 27

*Al Harman Islamic Foundation v. Department of the Treasury*, 686 F.3d 965 (9th Cir. 2011)... 20

*Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003).............................................. 28

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U. S. 721 (2011) .............. 17

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003) ...................................... 27

*Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786 (2011)................................................. 18, 21

*Conn. Dep't of Envtl. Protection v. OSHA*, 356 F.3d 226 (2d Cir. 2004) ...................................... 27

*Cornelio v. Connecticut*, 32 F.4th 160 (2d Cir. 2022) ................................................................. 18

*Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d. 220 (N.D. Tex. 2019)............................... 23, 24

*FCC v. Fox TV Stations, Inc.*, 567 U.S. 239 (2012) ......................................................... 21, 22, 25

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982)........................................... 22

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..................................................... 16, 22

*Kalantari v. NITV, Inc.*, 352 F.3d 1202 (9th Cir. 2003) ............................................................. 25

*Kirschenbaum v. 650 Fifth Avenue*, 257 F. Supp. 3d. 463 (S.D.N.Y. 2017).............................. 24

*Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019).......... 17

*Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133 (2d Cir. 2004) ....................................... 16

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d, 483 (2d Cir. 2013)............................................ 28

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ........................ 15

*Nichols v. Village of Pelham Manor*, 974 F. Supp. 243 (S.D.N.Y. 1997)..................................... 22

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................ 15

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024). ................................................................................ 16

*Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021). .................. passim

*Papachristou v. Jacksonville*, 405 U. S. 156 (1972)..................................................... 22

*Police Department of Chicago v. Mosley*, 408 U.S. 92 (1972) ................................... 16

*Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019) ............................................................ 17

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..................................................... 16, 17

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .......................................................... 24

*Reno v. ACLU*, 521 U.S. 844 (1997)........................................................................... 22

*Republican Party v. White*, 536 U.S. 765 (2002)........................................................ 21

*Roman Cath. Diocese v. Cuomo*, 520 U.S. 14 (2020) ................................................. 27

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............. 16, 18

*Sessions v. Dimaya*, 584 U.S. 148 (2018)................................................................... 22

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991).. 18

*TikTok Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020) ........................................... 26

*TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) ........................................... 26

*Travis v. Owego-Apalachin School Dist.*, 927 F.2d 688 (2d Cir. 2011)...................... 17

*United States v. Al-Arian*, 308 F. Supp. 2d. 1322 (M.D. Fla. 2004)........................... 23

*United States v. Playboy Entm't Group*, 529 U.S. 803 (2000) ................................... 18

*United States v. Schulte*, 436 F. Supp. 3d 747 (S.D.N.Y. 2020).................................. 22

*United States v. Williams*, 553 U.S. 285 (2008) ......................................................... 22

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ........................... 22

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ................................................................... 15

**Statutes**

108 Stat. 474, § 525(c)(3) (1994)................................................................................. 26

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ................ 8, 9, 16, 26

National Emergency Act, 50 U.S.C. §§ 1601 *et seq.*...................................................... 8

**Other Authorities**

Executive Order 13,928, *Blocking Property of Certain Persons Associated With the International Criminal Court,* 85 Fed. Reg. 36139 (June 11, 2020) ...................................................... passim

Executive Order 14,022, *Termination of Emergency with Respect to the International Criminal Court*, 86 Fed. Reg. 17895 (April 1, 2021)............................................................................. 11

Executive Order 14,148, *Initial Recissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025) .......................................................................................... 11

Executive Order 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 (Feb. 6, 2025) ..................................................................................... passim

H.R. 2617, 117th Cong. § 7073(b) (2023). ................................................................................ 20

H.R. Conf. Rep. No. 103-482 (1994).......................................................................................... 26

Rome Statute of the International Criminal Court, July 1, 2002, 2187 U.N.T.S. 90................. 2, 3

## INTRODUCTION

Executive Order 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 ("EO 14,203"), issued by President Donald Trump on February 6, 2025, unconstitutionally threatens Plaintiffs Gabor Rona and Lisa Davis with draconian civil and criminal penalties, including up to 20 years' of incarceration, for providing education, advice, training, information, analysis, and other services to or for the benefit of the Prosecutor of the International Criminal Court ("ICC") in aid of its investigation and prosecution of war crimes, crimes against humanity, and genocide.

EO 14,203 reinstates, in materially identical terms, unconstitutional restrictions on speech that the first Trump administration imposed on June 11, 2020 in Executive Order 13,928, *Blocking Property of Certain Persons Associated With the International Criminal Court,* 85 Fed. Reg. 36139 ("EO 13,928").   Plaintiff Rona, among others, commenced an action in this Court challenging the constitutionality of that Executive Order.   On January 4, 2021, Judge Katherine Polk Failla preliminarily enjoined the government from enforcing it against him and the other plaintiffs in that action, finding EO 13,928 to be an impermissible content-based restriction that likely could not survive the strict scrutiny required by the First Amendment.  *Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 212-13 (S.D.N.Y. 2021).  Indeed, EO 13,928 was such an unjustifiable restriction on the right of free speech that it likely could not survive intermediate scrutiny, either.  *Id*. at 212 n.7.  The government declined to appeal the Court's Order and the case was voluntarily dismissed without prejudice after EO 13,928 was rescinded.  *See* Stipulation of Dismissal at 3, *Open Soc'y Justice Initiative v. Trump*, No. 20 Civ. 8121 (KPF) (S.D.N.Y. Apr. 30, 2021).

1

EO 14,203, in pertinent part, is indistinguishable from its unconstitutional predecessor. Just as this Court did with its antecedent, so too should it enjoin the Defendants from enforcing EO 14,203 against the Plaintiffs in this action.  Like the prior Executive Order, its second coming violates the First Amendment by prohibiting speech based on content and viewpoint without being narrowly tailored to serve any compelling government interest.  Contrary to the Fifth Amendment, parts are so vague they fail to provide constitutionally required notice as to what is prohibited and thus are especially chilling.  The Executive Order is also *ultra vires* under the International Emergency Economic Powers Act ("IEEPA"), the legislation under which it was adopted, because it regulates informational materials despite Congress' decision to deny the President that authority. As with the prior action, Plaintiffs are irreparably harmed by the deprivation of their constitutional rights, and the balance of equities and the public interest decisively favor a preliminary injunction.

Despite its unconstitutionality, Plaintiffs are complying with EO 14,203 and desisting from speech that could be considered a violation of the Order.  In view of the Court's prior adjudication of substantively identical issues, the ongoing deprivation of Plaintiffs' rights, and the critical importance of restoring their free speech, Plaintiffs respectfully request that this motion be decided with as much dispatch as the Court is able.

## BACKGROUND

### I.    The International Criminal Court

The ICC is a permanent court, based in The Hague, The Netherlands.  It was created by a treaty, the Rome Statute of the International Criminal Court ("Rome Statute"), which currently has 125 States Parties from every region of the world.  The ICC may exercise jurisdiction over the investigation and prosecution of individuals accused of serious international crimes, including war crimes, crimes against humanity, and genocide.  States that ratify or accede to the Rome Statute consent to the investigation and prosecution of crimes within the ICC's jurisdiction alleged to have

occurred on their territory or by their nationals.  Rome Statute, art. 13, July 1, 2002, 2187 U.N.T.S. 90.  The ICC may thus exercise jurisdiction in a situation where the aforementioned crimes were committed by a State Party national, or in the territory of a State Party, or in a State that has accepted the jurisdiction of the Court.  The ICC may also exercise jurisdiction over crimes referred to the ICC Prosecutor by the UN Security Council pursuant to a resolution adopted under chapter VII of the UN Charter.  The Prosecutor may apply for an arrest warrant, which a three-member panel of judges must review to determine whether "[t]here are reasonable grounds to believe that the person has committed a crime within the jurisdiction of the Court."  *Id.* art. 58(1)(a).  The ICC has no independent enforcement power and relies on States to arrest individuals named in its arrest warrants.  *Id.* arts. 59, 89.

Within the ICC, the Office of the Prosecutor ("OTP") is responsible for investigating and prosecuting individuals allegedly responsible for committing crimes within its jurisdiction. Mr. Karim Khan is the Prosecutor of the ICC and the head of the OTP.  In 2021, he was elected to that position for a nine-year term by the States Parties to the Rome Statute.

Although the U.S. is not a party to the Rome Statute, it has supported investigations and prosecutions by the ICC.  For instance:

- **Ukraine** accepted the ICC's jurisdiction and subsequently became a party to the Rome Statute. Following a referral by 43 ICC States Parties, the ICC opened an investigation of crimes committed in Ukraine.  The ICC opened an investigation of crimes committed in Ukraine from 2013 onward.  In response, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[t]he United States welcomes the opening of the investigation by the ICC into atrocity crimes committed in Ukraine, and we intend to

3

engage with all stakeholders to achieve our common objectives in ensuring justice." Decl. of Christopher Hart, Ex. 1.

o Pursuant to this investigation, the ICC issued arrest warrants for Vladmir Putin and Maria Lvova-Belova for allegedly committing, among other war crimes, the deportation of children from occupied areas of Ukraine to Russia. According to the 2023 edition of the *Digest of United States Practice in International Law*, quoting a public delegate for the U.S. Mission to the UN, "[a]s President Biden noted, we believe the warrants are justified. The United States supports that investigation, as well as a range of other situations before the Court." *Id*. at Ex. 2.

o Congress enacted bipartisan legislation supporting U.S. involvement in and cooperation with the ICC's investigation in Ukraine. The State Department welcomed the legislation, noting that "[h]olding Russia to account for its war crimes and other atrocities within Ukraine and against its people is foundational to the defense of U.S. values and the maintenance of a peaceful, just, and secure world." *Id*. at Ex. 3.

• **Uganda** (a State Party to the Rome Statute) referred the situation on its territory, which included forced enlistment of children, sexual enslavement, and rape. *Id*. at Ex. 4. The U.S. played a leading role in facilitating the transfer to the ICC of Dominic Ongwen, a top commander of the Lord's Resistance Army, an armed group active in Uganda. *Id*. at Ex. 5. The State Department praised the ICC's prosecution and welcomed Ongwen's transfer and conviction, stating it hopes the ICC's "judgment demonstrates that justice must and will be done" for "the thousands of abducted young women and girls

subjected to horrific sexual violence, torture, and forced labor in the Lord's Resistance Army." *Id.* at Ex. 6.

- The **Democratic Republic of the Congo** (a State Party to the Rome Statute) referred the situation on its territory, where some 5.4 million people are reported to have died from war-related causes. *Id.* at Ex. 7. The U.S. facilitated the transfer to the ICC of a defendant, charged with war crimes and crimes against humanity, including murder, rape, sexual slavery, attacking civilians, pillaging, and recruiting child soldiers. *Id.* at Ex. 8. The State Department "welcome[d] the removal of one of the most notorious and brutal rebels ... to the International Criminal Court" and praised the U.S.'s "key role in the surrender" of that accused war criminal "to the ICC." *Id.* at Exs. 8; 9.

- The **Central African Republic** (a State Party to the Rome Statute) referred to the ICC the situation on its territory, which included mass rapes and killings. The State Department expressed support for "the ICC's investigations in the Central African Republic" and "commend[ed]" its "commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC." *Id.* at Ex. 10.

- The UN Security Council (of which the U.S. is a permanent member) referred the situation in Darfur, **Sudan** (which is not a State Party to the Rome Statute) to the ICC. At the time, atrocities committed in Darfur had resulted in "the loss of hundreds of thousands of civilian lives and the displacement of millions more from their homes in a campaign marked by ethnic cleansing." *Id.* at Ex. 11. The State Department announced it "fully support[ed] bringing to justice those responsible for crimes and atrocities" and "call[ed] upon the Sudanese Government to cooperate fully with the ICC." *Id.* at Ex. 12.

- The National Security Council, upon the ICC's issuance of a second arrest warrant for then-Sudanese President Omar al-Bashir on charges of genocide, extermination, torture, and rape, among other crimes, stated the U.S. "strongly supports international efforts to bring those responsible for genocide and war crimes in Darfur to justice and believes that there cannot be a lasting peace in Darfur without accountability." *Id.* at Ex. 13. The United States has also supported accountability efforts by the ICC following the recent resumption of the conflict. *Id.* at Ex. 25.

- The UN Security Council unanimously referred the situation in **Libya** (which is not a State Party to the Rome Statute) to the ICC, "condemning the violence and use of force against civilians" and "deploring the gross and systematic violation of human rights." *Id*. at Ex. 14. The U.S. stated that the referral "reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable" and "welcome[d] the swift and thorough work of the Prosecutor." *Id.* at Ex. 14

- **Mali** (which is a State Party to the Rome Statute) referred the situation regarding alleged international crimes in its territory to the ICC. Those crimes included murder, mutilation, torture, intentionally directing attacks against protected objects, and rape. The State Department stated that "[t]he United States supports efforts by the ICC and Malian authorities to provide justice for these serious crimes" and "commend[ed] Mali for its cooperation with the ICC." *Id.* at Ex. 15.

- The **Republic of Georgia** is a State Party to the Rome Statute. The ICC authorized the Prosecutor to investigate alleged war crimes perpetrated during Russia's invasion of Georgia's territory. The U.S. Mission to the United Nations praised the subsequent

6

"decisions of the International Criminal Court" to issue arrest warrants for such crimes. *Id.* at Ex. 16.

- **Venezuela** (which is a State Party to the Rome Statute) referred to the ICC alleged crimes against humanity occurring in its territory, including systematic torture and extrajudicial killings.  According to the 2023 edition of the *Digest of United States Practice in International Law*, quoting a public delegate for the U.S. Mission to the UN, the U.S. "welcomed … the Court's reauthorization of the Prosecutor's investigation in Venezuela. Victims of these atrocities continue to demand justice." *Id.* at Ex. 2.

In December 2023, the U.S., in a speech to the Assembly of States Parties to the ICC, confirmed its role in "providing practical assistance to the [OTP] across a range of its investigations," including "helping the Court track fugitives across several situations" by means of, *inter alia*, "offering rewards for their arrest" and "providing input and commentary on the [OTP's] policy papers." *Id.* at Ex. 17.  The U.S. also "conven[ed] meetings with experts from the U.S. government, the private sector, the Court, and other accountability mechanisms to identify practical solutions to some of the most difficult challenges facing international justice actors, including with respect to witness protection, insider witnesses, and cybersecurity." *Id.* at Ex. 17.

In October 2024, the U.S., in a statement to the UN General Assembly, "reiterate[d] its support for the ICC's efforts to deliver justice in situations where atrocities have been committed," including "in Ukraine, Darfur, and the Central African Republic." *Id.* at Ex. 18.

Notwithstanding the U.S.'s support for the aforementioned investigations, it has been critical of others.  In 2020, the ICC's Appeals Chamber authorized an investigation into crimes allegedly committed in Afghanistan (a State Party to the Rome Statute), including those allegedly

7

committed by the Taliban, Afghan security forces, and U.S. personnel. *Id.* at Ex. 19. This led to EO 13,928. In September 2021, Mr. Khan reported his decision "to focus [his] Office's investigations in Afghanistan on crimes allegedly committed by the Taliban and the Islamic State – Khorasan Province ('IS-K') and to deprioritise other aspects of this investigation," that is, investigations into U.S. personnel and Afghan security forces. *Id.* at Ex. 20. In January 2025, he applied for arrest warrants for senior Taliban leaders for the alleged crime against humanity of persecution on gender grounds. *Id.* at Ex. 21. No applications for arrest warrants have been announced for U.S. personnel.

In 2021, following authorization by the Pre-Trial Chamber, the OTP opened an investigation into the situation in Palestine (at the request of Palestine, a State Party to the Rome Statute). *Id.* at Ex. 22. On November 21, 2024, the ICC issued an arrest warrant for Mohammed Al-Masri, the highest commander of the military wing of Hamas, for the alleged crimes of murder, extermination, torture, rape and other form of sexual violence, hostage-taking, and outrages upon personal dignity. The request was terminated in February 2025, following confirmation of his death. *Id.* at Ex. 23. The OTP also requested arrest warrants for other senior Hamas leaders, Ismail Haniyeh and Yahya Sinwar, which were withdrawn upon confirmation of their deaths. *Id.* at Ex. 23. Arrest warrants were also issued for Benjamin Netanyahu, Prime Minister of Israel, and Yoav Gallant, Minister of Defense of Israel, for the alleged war crimes of starvation as a method of warfare and intentionally directing an attack against the civilian population; and the alleged crimes against humanity of murder, persecution, and other inhumane acts. *Id.* at Ex. 24.

## II.    Executive Orders 13,928 (2020) and 14,203 (2025)

Plaintiffs challenge the constitutionality of EO 14,203, which reinstates prohibitions on assistance to the Prosecutor of the ICC that the first Trump administration previously imposed via

EO 13,928, and which this Court preliminarily enjoined from being enforced against Plaintiff Rona and the other plaintiffs in that action.

IEEPA grants the President certain powers once the President has declared a national emergency under the National Emergency Act, 50 U.S.C. §§ 1601 *et seq.*, with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). When the President declares such an emergency, the President may:

> block … regulate ... void, prevent or prohibit, any acquisition, holding, withholding, use transfer, withdrawal, ... dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id*. § 1702(a)(1)(B).

Persons designated under § 1702(a)(1)(B) are placed on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained by the Office of Foreign Assets Control ("OFAC"). Persons who interact with a designated person in a prohibited manner are subject to penalties under IEEPA. These include civil fines in an amount equal to the greater of $377,700.17 or twice the value of a violative transaction, and criminal penalties in the form of a fine of up to $1,000,000, and, if a natural person, up to 20 years of imprisonment. 50 U.S.C. § 1705.

On June 11, 2020, President Trump issued EO 13,928, declaring a national emergency in connection with what it characterized as the ICC's "illegitimate assertions of jurisdiction over personnel of the United States and certain of its allies." EO 13,928, 85 Fed. Reg. 36139 (June 11, 2020). Section 1 authorized the Secretary of State to designate, *inter alia*, any foreign person who "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" investigation or prosecution of U.S. or allied personnel or any other designated person. *Id.* at 36140. Section 3 prohibited virtually any interaction with a

designated person, including "provision of funds, goods, or services by, to, or for the benefit of" such a person, and made interacting with a designated person in this manner subject to IEEPA's civil and criminal penalties.  *Id.*

On September 2, 2020, then-Secretary of State Michael Pompeo designated the then-Prosecutor of the ICC, Fatou Bensouda, as well as the then-head of the ICC's Jurisdiction, Complementarity and Cooperation Division, Phakiso Mochochoko, for sanctions under EO 13,928.  OFAC added Ms. Bensouda and Mr. Mochochoko to the SDN List.

On October 1, 2020, Plaintiff Rona, among others, filed a complaint challenging the lawfulness of EO 13,928, raising, *inter alia*, the following causes of action

> a.  The Order violated the First Amendment because it prohibited speech to and in support of the Prosecutor, and subjected the plaintiffs to civil and criminal penalties for engaging in such speech.
>
> b.  The Order violated the Fifth Amendment because it failed to provide the notice required by due process as to what acts were prohibited and thus permitted arbitrary enforcement.
>
> c.  The Order was *ultra vires* because it regulated acts exempt from regulation under IEEPA.

Plaintiff Rona, as well as the action's other plaintiffs, moved for a preliminary injunction. On January 4, 2021, the Court granted the motion in part, concluding they were likely to succeed on the First Amendment claim.  Finding that EO 13,928 restricted speech based on content, the Court applied strict scrutiny and found the restrictions on speech were "not narrowly tailored" because they "prohibit[ed] or chill[ed] significantly more speech than" necessary to achieve the government's objective of inducing those designated under the Order to "desist from their

investigation of U.S. and allied personnel." *Open Soc'y*, 510 F. Supp. 3d at 212-13.   The Court further found that the EO would likely fail under intermediate scrutiny as well because it "burden[s] substantially more speech than necessary."   *Id.* at n.7.   The Court enjoined the Defendants from "enforcing IEEPA's civil or criminal penalty provisions against [p]laintiffs for conduct specifically addressed in [p]laintiffs' [c]omplaint" and in the Court's Order.  *Id.* at 217. Defendants did not appeal the Order.

After President Biden took office, he issued Executive Order 14,022, *Termination of Emergency with Respect to the International Criminal Court*, 86 Fed. Reg. 17895 (April 1, 2021) ("EO 14,022"), "terminat[ing] the national emergency declared in Executive Order 13928… and revok[ing] that order…."  On April 5, 2021, OFAC removed Ms. Bensouda and Mr. Mochochoko from the SDN List.  On April 30, 2021, the Court granted a voluntary dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

Upon President Trump's return to office, on January 20, 2025, he "revoked" EO 14,022 by issuing Executive Order 14,148, *Initial Recissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025).   On February 6, 2025, President Trump issued EO 14,203, imposing sanctions against persons who provide certain types of assistance to the ICC or persons designated under the EO.

EO 14,203 declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute" any U.S. personnel without the consent of the U.S., or of personnel of countries that are U.S. allies and who are not parties to the Rome Statute, or have not otherwise consented to ICC jurisdiction.  EO 14,203, 90 Fed. Reg. 9370.  EO 14,203 specifically refers to the arrest warrants issued for "Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant."  *Id.* at 9369.

EO 14,203 designates Mr. Khan for sanctions. *Id*. at 9373. On February 13, 2025, OFAC added Mr. Khan to the SDN List.

Section 3(a) of EO 14,203 is identical to Section 3(a) of EO 13,928, *i.e.*, the language which this Court determined likely violated the First Amendment. As EO 13,928 had done, it prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order." *Id*. at 9370. Consequently, engaging in activity described in Section 3(a) in regard to Mr. Khan subjects those who do so to civil and criminal penalties.

EO 14,203 does not define key terms, including: "services to or in support of," and "services by, to, or for the benefit of." *Id.* Neither OFAC nor any other agency has issued regulations interpreting these terms.

### III. Plaintiffs' Interactions with the ICC

Prior to EO 14,203, the Plaintiffs in this action provided education, training, advice, information, analysis, and other services to Mr. Khan and others in the OTP.

**Plaintiff Rona** is Professor of Practice at the Benjamin N. Cardozo School of Law in New York and Director of the Law and Armed Conflict Project at the Cardozo Law Institute in Holocaust and Human Rights. Decl. of Gabor Rona ¶ 4. Prior to EO 14,203, Plaintiff Rona, *inter alia*:

(a) submitted an *amicus curiae* brief to the ICC in support of the OTP's position that the ICC may exercise jurisdiction over alleged crimes committed in Afghanistan where those crimes occurred in third countries that are States Parties to the Rome Statute;

(b) contributed to online journals and blogs about international criminal law, including the *Just Security* blog, where he wrote in support of positions taken by the OTP and made recommendations for the Prosecutor's investigation of war crimes in Ukraine;

(c) spoke in support of the OTP on panels, including one hosted by the Center on National Security at Fordham Law School about the Prosecutor's investigation of crimes committed in Ukraine;

(d) discussed ongoing investigations by the OTP in courses he teaches at Cardozo and Columbia Law Schools; and

(e) communicated with the OTP to facilitate placement of students in jobs and internships in positions that support the ICC's prosecutions.

*Id.* at ¶¶ 9-13.

**Plaintiff Davis** is Senior Associate Dean of Clinical Programs at CUNY School of Law. Decl. of Lisa Davis ¶ 3. Plaintiff Davis is also the Special Adviser to the Prosecutor on Gender and Other Discriminatory Crimes, having previously served as Special Adviser on Gender Persecution. Prior to EO 14,203, Plaintiff Davis, *inter alia*:

(a) drafted the OTP's *Policy on the Crime of Gender Persecution*;

(b) provided guidance to all country teams within the OTP regarding investigating, charging, and prosecuting crimes that may amount to gender persecution;

(c) trained investigators, analysts, and prosecutors within the OTP regarding methods for working with victims in a gendered-informed way;

(d) liaised with victim groups to identify potential individuals willing to provide evidence to the OTP and facilitated victims' engagement with the OTP;

(e) served on the Advisory Committees for the OTP's *Sexual and Gender-Based Crimes Policy* and its *Policy on Children*, participated in review sessions with the lead drafters of those policies, commented on drafts, and assisted in their publication and promotion;

(f) presented in-country training for domestic prosecutors and judges concerning situations under investigation by the OTP;

(g) contributed to the development of an external support base for the OTP's work.

*Id.* at ¶¶ 7-23.

The designation of Mr. Khan subjects Plaintiffs to civil and criminal penalties under IEEPA if they interact with Mr. Khan in a manner prohibited by EO 14,203. Consequently, Plaintiffs have discontinued providing education, advice, training, information, and other assistance to or for the benefit of Mr. Khan. Plaintiffs have also, among other things, discontinued providing such services to others in the OTP. For instance:

Plaintiff Rona has reconsidered plans to submit *amicus curiae* briefs supportive of the OTP. He has also discontinued communications with the OTP concerning placement of students in jobs and internships to assist the OTP and reconsidered whether and how to discuss the OTP and its investigations and prosecutions in courses, speaking engagements, and scholarship.

Plaintiff Davis has discontinued interacting with, and providing advice to, Mr. Khan and others in the OTP. Among other things, Plaintiff Davis has ceased engaging with victim populations to facilitate the transfer of evidence to the OTP; desisted from drafting the *Public Principles on Gender Persecution*; and refrained from developing further policies for the OTP related to gender persecution and other discriminatory crimes.

Plaintiffs would have performed such acts while in the United States and their speech would have been communicated to recipients in other countries via the Internet or telephonically. Rona Decl. ¶¶ 14-16; Davis Decl. ¶¶ 28-29.

14

**ARGUMENT**

A plaintiff seeking a preliminary injunction must establish that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also Open Soc'y*, 510 F. Supp. at 207. When the government is a party to the suit, "the final two factors merge." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Just as this Court previously found with respect to EO 13,928, all criteria are satisfied in regard to EO 14,203.

## I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits. EO 14,203 violates the First Amendment by imposing content- and viewpoint-based restrictions on speech that are not narrowly tailored to any compelling government interest. Although the Executive Order states it is intended to prevent the ICC from investigating U.S. personnel or the personnel of U.S. allies without the consent of their governments, and references arrest warrants for Israeli officials, EO 14,203, 90 Fed. Reg. 9369-70, it prohibits speech unrelated to that purported interest. Indeed, Plaintiffs are barred from engaging in speech that supports the ICC's efforts to investigate and prosecute crimes that the United States *itself* has urged the ICC to address, including in Ukraine, Uganda, Sudan, the Democratic Republic of Congo, the Central African Republic, Libya, Mali, Georgia, and Venezuela. In the words of this Court when concluding that EO 13,928 likely violated the First Amendment, its latest incarnation fails strict scrutiny because it "prohibit[s] or chill[s] significantly more speech than even Defendants seem to believe is necessary to achieve their end." *Open Soc'y*, 510 F. Supp. at 212-13. Moreover, the Order is unconstitutionally vague because it does not provide the notice required by the Fifth Amendment as to what conduct is prohibited. It chills

15

Plaintiffs from exercising their rights to free speech. And, contrary to Congress' decision to exempt from IEEPA the provision of information or informational materials, 50 U.S.C. §1702(b)(3), EO 14,203 regulates and prohibits their transmission.

### A. EO 14,203 Violates the First Amendment.

Under the First Amendment, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95 (1972); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (same). EO 14,203, however, imposes restrictions that are based on both content and viewpoint.

The restrictions are content-based because whether Plaintiffs may speak "depends on what they say." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 27 (2010). Plaintiffs are forbidden from engaging in speech that constitutes "services by, to, or for the benefit of" Mr. Khan. EO 14,203, 90 Fed. Reg. 9370. This is a quintessential content-based restriction. As this Court previously determined, the Order is a "content-based restriction" because "Plaintiffs' speech is restricted if, and only if, it has the function or purpose of benefitting" Mr. Khan. *Open Soc'y*, 510 F. Supp. at 211. *See also Reed*, 576 U.S. at 163 ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

EO 14,203 also restricts speech based on viewpoint. "[V]iewpoint discrimination is uniquely harmful to a free and democratic society." *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024). "Viewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination'" in which "'the government targets not subject matter but particular views taken by speakers on a subject.'" *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

That is what EO 14,203 does.  It prohibits Plaintiffs from engaging in speech that benefits Mr. Khan, including speech in support of investigations or prosecutions he is undertaking.  The Order, however, does not prohibit speech that takes a contrary view.  For instance, while Plaintiffs are prohibited from submitting *amicus* briefs that support positions advanced by Mr. Khan, because that would "benefit" him, they are *permitted* to submit briefs that oppose positions advanced by him.  Likewise, Plaintiffs are barred from facilitating the submission of evidence, including from witnesses and victims, for use by Mr. Khan or others in the OTP in connection with investigations and prosecutions undertaken by him and his Office.  By contrast, no prohibition prevents supplying evidence to help defend those under investigation or facing prosecution.

The restrictions thus apply based not on the *topic* of speech, but a person's *views* about that topic.  *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 239 (2d Cir. 2019), *vacated on mootness grounds*, 141 S. Ct. 1220 (2021) ("block[ing on Twitter] ... persons expressing viewpoints [President] finds distasteful" is impermissible "viewpoint discrimination"); *Ragbir v. Homan*, 923 F.3d 53, 69-70 (2d Cir. 2019), *vacated and remanded on other grounds*, 140 S. Ct. 1959 (2020) (ordering removal of immigrant for engaging in speech in favor of immigrants' rights is impermissibly viewpoint-based); *Travis v. Owego-Apalachin School Dist.*, 927 F.2d 688, 693-694 (2d Cir. 2011) (allowing Christmas-themed events but not pro-life events in school is impermissibly viewpoint-based).

EO 14,203's content- and viewpoint-based restrictions are only permitted if they can survive strict scrutiny.  *Reed*, 576 U.S. at 166.  This requires Defendants to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."  *Id.* at 171 (quoting *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U. S. 721, 734 (2011)).  A law is not narrowly tailored if a less restrictive alternative would serve that interest.

*United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000).  Strict scrutiny is especially exacting for viewpoint discrimination—"an egregious form of content discrimination" that is "presumed to be unconstitutional."  *Rosenberger*, 515 U.S. at 828-29.

Even assuming *arguendo* that EO 14,203 serves a compelling government interest—which it does not—the restrictions it imposes are not narrowly tailored to any such interest.[1]

*First*, the Order is overinclusive.  A law is overinclusive if it prohibits speech that is not part of the problem it is meant to solve.  *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (holding law restricting sale of video games to minors overinclusive with respect to the interest of "assisting concerned parents" because it prohibited sale to minors whose parents "think violent games are a harmless pastime"); *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 122 (1991) (finding overinclusive law requiring publisher of works in which author admits to committing crimes to transfer proceeds into escrow accounts for benefit of crime victims with respect to the interest of compensating victims from the fruits of crime because the law "reaches a wide range of literature," including where the criminal does not "profit from his crime while a victim remains uncompensated"); *Cornelio v. Connecticut*, 32 F.4th 160, 175 (2d Cir. 2022) (concluding sex offender disclosure requirement plausibly fails even intermediate scrutiny as overinclusive because it "applies to all persons subject to the sex offender registration law, including registrants who have never engaged in the sort of illicit online activity that the government seeks to deter").

EO 14,203 is clear about the problem it is intended to address: the investigation or prosecution by the ICC of U.S. persons and persons of certain allied countries without their

---

[1] The government has the burden to identify such an interest.  *See Playboy*, 529 U.S. at 816-817.

consent.  EO 14,203, 90 Fed. Reg. 9369 ("The United States unequivocally opposes and expects our allies to oppose any ICC actions against the United States, Israel, or any other ally of the United States that has not consented to ICC jurisdiction.").  To that end, it declares a national emergency consisting of "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons, as defined in section 8(d) of this order."  There have been two such investigations: Afghanistan and Palestine.  *Id*. at 9370.

The Order, however, sweeps far wider.  Section 3(a) prohibits the provision of services to, or for the benefit of, Mr. Khan of *any* kind—regardless of whether the services are connected to any investigative or prosecutorial effort falling within the ambit of the putative national emergency.  *Id*.

Indeed, the Order prohibits Plaintiffs from providing such assistance even in connection with the investigation and prosecution of alleged crimes in situations where the U.S. has *endorsed* investigative and prosecutorial efforts by the ICC and commended others for assisting those efforts.  This includes, for example, the ICC's pending efforts concerning the extrajudicial executions, torture, attacks on civilian infrastructure, mass child abductions, and sexual and gender-based violence that has been committed in Ukraine.  The Order bars such assistance even though Congress enacted legislation supporting U.S. involvement in the ICC's investigation.  H.R. 2617, 117th Cong. § 7073(b) (2023).  The same prohibitions block assistance concerning other situations where the U.S. has supported the ICC's investigative and prosecutorial work, including in regard to crimes committed in the Democratic Republic of Congo, the Central African Republic, Sudan, Libya, and Mali.

EO 14,203 thus forbids Plaintiffs from providing advice, training, information, and other support even with respect to matters disconnected from the putative national emergency that it

declares.  For instance,  Plaintiff Rona is prevented from speaking on topics such as modalities for States, including non-Parties like the U.S., to cooperate with the OTP.  Similarly, Plaintiff Davis is prevented from educating investigators, analysts, and prosecutors about how to effectively work with victims.  This includes training on working with marginalized populations to ensure sensitivity and minimize re-traumatization. Plaintiff Davis is also prohibited from interacting with victims and witnesses of international crimes and facilitating their engagement with the OTP.

EO 14,203 is therefore overinclusive.  In *Al Harman Islamic Foundation v. Department of the Treasury*, the Ninth Circuit considered the constitutionality of barring an entity from providing speech-based assistance—co-sponsoring events, holding demonstrations, contacting the government, organizing public education activities, and issuing press releases—to a specially designated terrorist organization.  The Court of Appeals found the prohibition violated the First Amendment because it was not narrowly tailored to the "concededly compelling government interest of preventing terrorism" as there was "little evidence that the pure-speech activities proposed by [the plaintiff] on behalf of the [designated] domestic branch [would] aid the larger international organization's sinister purpose."  686 F.3d 965, 997, 1001 (9th Cir. 2011).

Likewise, this Court concluded that EO 14,203's analogue in EO 13,928 was overinclusive because it "prohibit[ed] or chill[ed] significantly more speech than even Defendants seem[ed] to believe [was] necessary to achieve their end, *i.e.*, to obtain and exert leverage over [designated officials in the OTP] so as to induce them to desist from their investigation of U.S. and allied personnel."  *Open Soc'y*, 510 F. Supp. at 212-13.   The same is equally true for that Order's doppelganger.

*Second*, EO 14,203 is underinclusive.  Laws are underinclusive where they prohibit only a subset of the speech that should be prohibited for the government to achieve its articulated interest.

*See, e.g.*, *Brown*, 564 U.S. at 805; *Republican Party v. White*, 536 U.S. 765, 780 (2002).  Here, the Order restricts speech that benefits the ICC's efforts to investigate or prosecute crimes allegedly committed by U.S. persons or persons of U.S. allies without their consent.  But the same alleged crimes are subject to the domestic criminal jurisdiction of third States, which may be exercised without the consent of the U.S. or allied countries.  EO 14,203, however, does nothing to regulate speech that aids such investigations or prosecutions without the consent of the U.S. or its allies.  It is therefore underinclusive.  *Brown*, 564 U.S. at 805 (holding law restricting sale of violent video games to children is underinclusive with respect to the interest of protecting children from portrayals of violence because the law did not prohibit portrayals of violence in other media); *White*, 536 U.S. at 780 (finding underinclusive law designed to preserve judicial impartiality that prohibited judicial candidates from expressing views on political issues because the law did not prohibit expressing such views before becoming candidates or after election).

### B.  EO 14,203 Is Unconstitutionally Vague.

EO 14,203 violates the Fifth Amendment's Due Process Clause because its prohibitions fail to provide the constitutionally required notice as to what activities are proscribed.[2]

 "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *FCC v. Fox TV Stations*, *Inc.*, 567 U.S. 239, 253-254 (2012).  A law is "unconstitutionally vague if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

---

[2] This Court's partial granting of the motion for preliminary injunction with respect to EO 13,928 determined that the claims asserted therein concerning the vagueness of provisions of that EO relating to the designation of non-U.S. persons were not ripe.  Unlike the prior action, this action does not assert claims regarding designation under EO 14,203.

enforcement.'"  *United States v. Schulte*, 436 F. Supp. 3d 747, 752 (S.D.N.Y. 2020) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008));  *see also Sessions v. Dimaya*, 584 U.S. 148, 155-56, 175 (2018) (quoting *Papachristou v. Jacksonville*, 405 U. S. 156, 162 (1972)) ("The void-for-vagueness doctrine ... guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes[.]").

The "degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498 (1982).  The "vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect."  *FCC*, 567 U.S. at 254-55 (quoting *Reno v. ACLU*, 521 U.S. 844, 871-872 (1997) (alteration in *FCC*)).  If a law "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."  *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187 (2d Cir. 2010) (internal citations and quotations omitted); *Nichols v. Village of Pelham Manor*, 974 F. Supp. 243, 254 (S.D.N.Y. 1997) (finding phrase vague where its "indeterminate meaning… might cause the suppression of protected speech").

Section 3 of EO 14,203 prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" a designated person.  EO 14,203, 90 Fed. Reg. 9370. It also prohibits "the receipt of any contribution or provision of funds, goods, or services from" a designated person.  *Id*.  None of the terms contained in Section 3 is defined.  Nor has the government issued guidance explaining the prohibitions' meaning in the context of the EO.  There are no examples of prohibited activity or "narrowing definitions" that might "increase[] the clarity of the … terms."  *Holder*, 561 U.S. at 8-9, 21.

EO 14,203 is thus unconstitutionally vague. In *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d. 220, 230-34, 243 (N.D. Tex. 2019), the court considered identical language in EO 13,661, 79 Fed. Reg. 15535. *See id*. at 230. Focusing on the part of EO 13,661 that proscribed "receipt of ... services," the *Exxon* court ruled that this language "fail[ed] to provide ascertainable certainty" and, thus, a penalty based on the Order "violate[d] the Due Process Clause of the Fifth Amendment." *Id*. at 234, 243. That was because, since *Black's Law Dictionary* defines "service" as, *inter alia*, a "useful act or series of acts for the benefit of another," it was unclear whether the Order prohibited "*any* incidental receipt of a benefit resulting from the services" or whether the prohibition applied only in "circumstances in which … services are *aimed* at benefitting" a person. *Id*. at 231-33 (second emphasis added) (internal quotation marks omitted).

The other prohibitions contained in Section 3 of EO 14,203 are equally vague. In *United States v. Al-Arian*, 308 F. Supp. 2d. 1322, 1340-41 (M.D. Fla. 2004), the court considered regulations implementing an EO that made unlawful "the making or receiving of any contribution of funds, goods, or services *to or for the benefit of*" a designated terrorist (emphasis added) (internal quotation marks omitted). The court interpreted the language to include "some additional intent to further future unlawful activity to support criminal liability" because "without such a *scienter* requirement the prohibitions in the EO may be unconstitutionally vague or violate the Fifth Amendment's requirement of personal guilt." *Id*. at 1340-41 (first emphasis added) (internal quotation marks omitted); *see also id*. at 1341 n.38 (noting "'services' is broadly defined" and "without a *scienter* requirement, could easily include protected expression").

The unconstitutional ambiguity of the phrase "services … for the benefit of" is compounded by the lack of clarity as to how "services … *to*" a designated person is distinct from "services ... *for the benefit* of" such a person. *Kirschenbaum v. 650 Fifth Avenue*, 257 F. Supp.

3d. 463, 517 (S.D.N.Y. 2017) ("Principles of statutory construction ... require that each term be given a separate meaning") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). *Black's Law Dictionary*, which defines "service" itself as, *inter alia*, a "useful act ... for the benefit of another," underscores the difficulty of distinguishing these terms. *Exxon*, 430 F. Supp. 3d. at 231. Assuming that "services … for the benefit of" is intended to have a broader scope than "services … to" a designated person, there are no means by which it can be ascertained how broadly "benefit" might be defined. Plaintiffs, for example, have no notice of whether they will be punished only for speech that directly benefits Mr. Khan, such as addressing reports to him, or for all speech that benefits him, albeit indirectly, such as speech directed at others in the OTP or speech to a public audience that would cast Mr. Khan's activities in a favorable light. Likewise, Plaintiffs have no notice of whether they will be punished for speech that was not published with the intent of benefiting Mr. Khan but which he independently decides to employ.

This vagueness places Plaintiffs in an untenable position. For instance, it is uncertain whether drafting a manual on best practices for interviewing survivors of sexual and gender-based violence in the context of an international criminal investigation constitutes a "service[] … for the benefit of" Mr. Khan, if he or the OTP makes use of the manual, thereby providing Mr. Khan with an *incidental* benefit, although the manual is *aimed* at a different or wider audience. It is also uncertain whether delivering a lecture about the importance of ICC prosecutions for promoting accountability for international crimes or speaking favorably as a panelist about ongoing investigations undertaken by the OTP is a "service[] … for the benefit of" Mr. Khan. Plaintiffs have been forced to reconsider and refrain from these, and other First-Amendment protected activities, out of fear that they may violate the EO.

At bottom, EO 14,203 gives Plaintiffs no guidance as to what speech will subject them to penalties.  As a consequence, it chills all speech that relates to the work of the OTP, including interactions with the Prosecutor's staff, writing articles supportive of positions taken by the OTP, and speaking favorably about the OTP in classrooms or other public fora.  Thus, the ambiguity of what is prohibited under the EO both "raises special First Amendment concerns because of its obvious chilling effect" and "fail[s] to provide" Plaintiffs "fair notice of what is prohibited."  *FCC*, 567 U.S. at 254-55 (internal quotation marks omitted).

### C.  *EO 14,203 Is* Ultra Vires *Under IEEPA.*

IEEPA contains an express exemption that bars the President from regulating or prohibiting, "directly or indirectly,"

> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3).

Congress intended this provision, which it enacted in 1988 as an amendment to IEEPA, "to have a broad scope" and to "prevent the executive branch from restricting the international flow of materials protected by the First Amendment."  *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (quoting H.R. Conf. Rep. No. 103-482, at 239 (1994)).  Indeed, when OFAC subsequently interpreted the provision too "narrowly and restrictively," *id.*, Congress further amended the statute to clarify that the exemption applies "regardless of format or medium of transmission."  108 Stat. 474, § 525(c)(3) (1994).

EO 14,203, however, omits any reference to the exception.  The silence and lack of clarification, particularly considering the broad scope of prohibited activities, including the provision of "services by, to, or for the benefit of" Mr. Khan, implies that the Order does not

exempt importation or exportation of information or informational materials, as the statute requires. The statutory exception, however, applies to Plaintiffs' speech because it is informational in nature, exported to The Netherlands, and transmitted telephonically or via the Internet. *See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 112, 115 (D.D.C. 2020) (preliminarily enjoining prohibitions on transactions involving TikTok because, *inter alia*, they "likely constitute[d] indirect regulations of … the exchange of 'information or informational materials'") (emphasis omitted); *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 81, 83 (D.D.C. 2020) ("Plaintiffs have demonstrated that they are likely to succeed on their claim that the prohibitions constitute indirect regulations of … the exchange of 'information or informational materials'" because, *inter alia*, the prohibitions prevent U.S. TikTok users from sharing "films, photographs, art, and news with users across international borders") (emphasis omitted). As such, the restrictions on Plaintiffs' speech exceed the President's authority under IEEPA.[3]

## II.    EO 14,203 Is Causing Irreparable Harm.

Plaintiffs are suffering irreparable harm from EO 14,203. As this Court stated when enjoining enforcement of EO 13,928 against Plaintiff Rona and others, "Plaintiffs have 'established an actual chilling effect' [since] the prospect of enforcement under IEEPA has caused Plaintiffs not to speak, and hence to forgo exercising their First Amendment rights" and a

---

[3] This Court's order concerning EO 13,928 determined that the claim that it was *ultra vires* under IEEPA was not ripe because Defendants "acknowledged that IEEPA's language is 'clear' and that the Executive Order '"shall be implemented consistent with applicable law."'" *Open Soc'y*, 510 F. Supp. 3d at 216 (quoting Defendants' opposition to the motion for preliminary injunction and EO 13,928 § 11(b)). Defendants have not made such an acknowledgement with respect to EO 14,203.

preliminary injunction "would eliminate this chill and prevent irreparable harm." *Open Soc'y*, 510 F. Supp. 3d at 216 (cleaned up and internal quotations omitted).

Indeed, courts "presume[]" irreparable harm when a plaintiff "alleges injury from a rule or regulation that directly limits speech." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003); *see also Agudath Isr. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Roman Cath. Diocese v. Cuomo*, 520 U.S. 14, 19 (2020)). EO 14,203 limits Plaintiffs' speech by subjecting them to enforcement under IEEPA for speech based on content and viewpoint. Thus, Plaintiffs have *ipso facto* demonstrated irreparable harm. *Conn. Dep't of Envtl. Protection v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("alleged violation of a constitutional right triggers a finding of irreparable injury").

Although Plaintiffs need not do so to obtain injunctive relief, they have also shown irreparable harm by "establishing an actual chilling effect." *Bronx Household*, 331 F.3d at 349. The prospect of enforcement under IEEPA has caused Plaintiffs not to speak, and hence to forego exercising First Amendment rights. *Supra* at 13-16. Enjoining Defendants from enforcing penalties against Plaintiffs would eliminate this chill and allow them to exercise their right to free speech.

### III.    The Balance of the Equities and Public Interest Favor Relief.

The balance of the equities and the public interest favor an injunction. As the Court concluded in regard to EO 13,928, "the proffered national security justification for seeking to prevent and potentially punish Plaintiffs' speech is inadequate to overcome Plaintiffs' and the public's interest in the protection of First Amendment rights." *Open Soc'y*, 510 F. Supp. 3d at 217. So too does EO 14,203 violate the Constitution and IEEPA, and "[t]he Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v.*

*Walsh*, 733 F.3d, 483, 488 (2d Cir. 2013) (quoting *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).  Defendants thus lack any legally cognizable interest in enforcing civil or criminal penalties against Plaintiffs.  Moreover, injunctive relief would permit Plaintiffs to continue providing assistance and support in regard to the investigation and prosecution of the most serious of international crimes, including in relation to situations where the U.S. itself has endorsed the ICC as the appropriate forum.

## CONCLUSION

The Court should preliminarily enjoin Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs under EO 14,203.

Dated: April 15, 2025

Respectfully submitted,

**GABOR RONA AND LISA DAVIS**

By their attorneys,

/s/ Nicholas M. Renzler
Andrew B. Loewenstein (*pro hac vice* to be
    submitted)
Christopher Hart (*pro hac vice* to be submitted)
Ariella Katz Miller (*pro hac vice* to be submitted)
FOLEY HOAG LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-832-1000
aloewenstein@foleyhoag.com
chart@foleyhoag.com
arkatz@foleyhoag.com

Nicholas M. Renzler (NR1608)
Hannah E. Sweeney (pending admission)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
212-812-0400
nrenzler@foleyhoag.com
hsweeney@foleyhoag.com

James A. Goldston (2327435)
Esti T. Tambay (ET2721)
Genevieve B. Quinn (GQ9239)
OPEN SOCIETY FOUNDATIONS
Open Society Justice Initiative
224 West 57th Street
New York, NY 10019, United States
212-548-0600
james.goldston@opensocietyfoundations.org
esti.tambay@opensocietyfoundations.org
genevieve.quinn@opensocietyfoundations.org

*Counsel for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(c)**

I, Nicholas Renzler, counsel for Plaintiffs, hereby certify that the foregoing memorandum of law complies with the word count limitation set forth in the Rule 7.1(c) of the Local Rules of the U.S. District Court for the Southern District of New York. This document memorandum contains 8,329 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates, as permitted by Local Rule 7.1(c).


*/s/ Nicholas M. Renzler*
Nicholas M. Renzler

## CERTIFICATE OF SERVICE

I, Nicholas M. Renzler, hereby certify that, in accordance with Rule 5(b)(2)(B) of the

Federal Rules of Civil Procedure, service of this document will be made on Defendants on April

15, 2025 by hand-delivery to:

a.  DONALD J. TRUMP, President of the United States
    1600 Pennsylvania Ave., NW
    Washington, D.C. 20500


b.  UNITED STATES DEPARTMENT OF STATE
    2201 C St., NW
    Washington, D.C. 20520


c.  MARCO A. RUBIO, Secretary of State
    UNITED STATES DEPARTMENT OF STATE
    2201 C St., NW
    Washington D.C. 20520


d.  UNITED STATES DEPARTMENT OF THE TREASURY
    1500 Pennsylvania Ave., NW
    Washington, D.C. 20220


e.  SCOTT K. H.  BESSENT, Secretary of the Treasury
    UNITED STATES DEPARTMENT OF THE TREASURY
    1500 Pennsylvania Ave., NW
    Washington, D.C. 20220


f.  UNITED STATES DEPARTMENT OF JUSTICE
    950 Pennsylvania Ave., NW
    Washington, D.C. 20530

31

g. PAMELA BONDI, United States Attorney General
   UNITED STATES DEPARTMENT OF JUSTICE
   950 Pennsylvania Ave., NW
   Washington, D.C. 20530


h. OFFICE OF FOREIGN ASSETS CONTROL
   United States Department of the Treasury
   1500 Pennsylvania Ave., NW
   Washington, D.C. 20220


i. LISA M. PALLUCONI, Acting Director, Office of Foreign Assets Control
   United States Department of the Treasury
   1500 Pennsylvania Ave., NW
   Washington, D.C. 20220


j. United States Attorney's Office
   Southern District of New York
   Civil Process Clerk
   86 Chambers Street, 3rd Floor
   New York, New York 10007


*/s/ Nicholas M. Renzler*
Nicholas M. Renzler