**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GABOR RONA and LISA DAVIS,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States
1600 Pennsylvania Ave., N.W.
Washington, D.C. 20500;

UNITED STATES DEPARTMENT OF
STATE
2201 C St., N.W.
Washington, D.C. 20520;

MARCO A. RUBIO, in his official capacity
as Secretary of State
2201 C St., N.W.
Washington, D.C. 20520;

UNITED STATES DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220;

SCOTT K. H. BESSENT, in his official
capacity as Secretary of the Treasury
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220;

UNITED STATES DEPARTMENT OF
JUSTICE
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530;

PAMELA J. BONDI, in her official capacity
as United States Attorney General
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530;

Civil Action No. _____

OFFICE OF FOREIGN ASSETS CONTROL
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220; and

LISA M. PALLUCONI, in her official
capacity as Acting Director, Office of Foreign
Assets Control
1500 Pennsylvania Ave., N.W.
Washington, D.C. 20220,

                    Defendants.

## COMPLAINT

### INTRODUCTION

1.   Plaintiffs Gabor Rona and Lisa Davis, two distinguished law professors, the latter also a Special Adviser to the Prosecutor of the International Criminal Court ("ICC"), bring this action to challenge the lawfulness of Executive Order 14,203, *Imposing Sanctions on the International Criminal Court*, 90 Fed. Reg. 9369 ("EO 14,203"), issued by President Donald J. Trump on February 6, 2025.

2.   EO 14,203 threatens to unconstitutionally impose civil and criminal penalties, including up to 20 years' incarceration, on Plaintiffs for providing education, advice, training, information, analysis, and other services to or for the benefit of the Prosecutor of the ICC, in aid of the ICC's investigation and prosecution of war crimes, crimes against humanity, and genocide.

3.   EO 14,203 reinstates, in materially identical terms, unconstitutional restrictions on speech that the first Trump Administration imposed on June 11, 2020 in Executive Order 13,928, *Blocking Property of Certain Persons Associated With the International Criminal Court,* 85 Fed. Reg. 36139 ("EO 13,928"). Under that Executive Order, the Secretary of State had designated for

sanctions the then-Prosecutor of the ICC, as well as another ICC official in the Office of the Prosecutor.

4.  On October 1, 2020, Plaintiff Rona, among others, commenced an action in this Court challenging the constitutionality of EO 13,928 and subsequently moved for a preliminary injunction enjoining its enforcement against them.

5.  On January 4, 2021, Judge Katherine Polk Failla preliminarily enjoined the government from enforcing EO 13,928 against Plaintiff Rona and the other plaintiffs in that action.

6.  Judge Failla found EO 13,928 likely to be an impermissible restriction on the right of free speech that could not survive the strict scrutiny required by the First Amendment. *Open Soc'y Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 212-13 (S.D.N.Y. 2021). In fact, Judge Failla further found that EO 13,928 was such an unjustifiable restriction on the right of free speech that it likely could not survive intermediate scrutiny, either. *Id.* at 212 n.7.

7.  The government declined to appeal this Court's January 4, 2021 Order. The action was voluntarily dismissed without prejudice after Executive Order 13,928 was rescinded.

8.  EO 14,203 now designates for sanctions the current Prosecutor of the ICC, Mr. Karim Khan.

9.  Like Section 3(a) of EO 13,928, Section 3(a) of EO 14,293 prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to" the Executive Order.

10. Consequently, engaging in any activity described in Section 3(a) of EO 14,203 in regard to Mr. Khan is unlawful and makes those who do so subject to civil and criminal penalties under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq*. These include civil and criminal fines, and, if a natural person, 20 years' incarceration.

11. In the past, Plaintiffs have engaged with Mr. Khan and the ICC's Office of the Prosecutor, including with respect to pending investigations and prosecutions. Plaintiffs provided services to or for the benefit of the Prosecutor and the Office of the Prosecutor by, among other things, providing services, advice, training, information, and analysis, and by undertaking public and private advocacy, including publications and presentations, in support of their mission and work.

12. Plaintiffs had intended to continue providing such services to or for the benefit of Mr. Khan and the Office of the Prosecutor.

13. EO 14,203 has injured Plaintiffs by prohibiting them from continuing to provide such and other services.

14. EO 14,203 has the same constitutional deficiencies as EO 13,928. It also has additional defects that render it unconstitutional and otherwise unlawful.

15. Among other things, EO 14,203 impermissibly restricts Plaintiffs' First Amendment rights to freedom of speech by prohibiting them from providing the speech-based services and assistance described above, including with respect to ICC investigations and prosecutions that the United States supports. The Executive Order also lacks the clarity required by the Fifth Amendment because key terms are unconstitutionally vague. Further, the Executive Order is *ultra vires* under IEEPA, its governing statute, because it purports to regulate and prohibit the provision of information and informational materials despite the statute's express exemption protecting such activity.

16. Accordingly, Plaintiffs seek a declaration that EO 14,203 violates the First and Fifth Amendments to the U.S. Constitution and is *ultra vires* under IEEPA. Plaintiffs also seek an order enjoining Defendants from enforcing IEEPA's civil and criminal penalties against them.

## JURISDICTION AND VENUE

17. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-02, and 5 U.S.C. § 706.

18. The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers. *See also* Fed. R. Civ. P. 57, 65.

19. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(c) because Plaintiff Rona resides in the Southern District of New York.

## PARTIES

20. Plaintiff Gabor Rona is a Professor of Practice at the Benjamin N. Cardozo School of Law in New York and Director of the Law and Armed Conflict Project at the Cardozo Law Institute in Holocaust and Human Rights.  Plaintiff Rona resides in New York, New York and is a citizen of the United States and Hungary.

21. Plaintiff Lisa Davis is a Professor of Law at the City University of New York School of Law and the Special Adviser on Gender and Other Discriminatory Crimes to the Prosecutor of the ICC.  Plaintiff Davis resides in Brooklyn, New York and is a citizen of the United States.

22. Plaintiffs Rona and Davis are suing in their personal capacities and not in connection with their universities or any other institutions.

23. Defendant Donald J. Trump is President of the United States and is sued in his official capacity.

24. Defendant Department of State is a United States agency headquartered in Washington, D.C.

25. Defendant Marco A. Rubio is the United States Secretary of State and is sued in his official capacity.

26. Defendant Department of the Treasury is a United States agency headquartered in Washington, D.C.

27. Defendant Scott K. H. Bessent is the United States Secretary of the Treasury and is sued in his official capacity.

28. Defendant Department of Justice is a United States agency headquartered in Washington, D.C.

29. Defendant Pamela J. Bondi is the United States Attorney General and is sued in her official capacity.

30. Defendant Office of Foreign Assets Control is a United States agency headquartered in Washington, D.C.

31. Defendant Lisa M. Palluconi is the Acting Director of the Office of Foreign Assets Control and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### The ICC and its Office of the Prosecutor

32. The ICC is a permanent court, based in The Hague, The Netherlands.  It was created by a treaty, the Rome Statute of the International Criminal Court ("Rome Statute"), which currently has 125 States Parties from every region of the world.

33. The ICC may exercise jurisdiction over the investigation and prosecution of individuals accused of serious international crimes, including war crimes, crimes against humanity, and genocide.

34. States that ratify or accede to the Rome Statute consent to the investigation and prosecution of crimes within the ICC's jurisdiction that are alleged to have occurred in their territory or by their nationals. Rome Statute, art. 13. The ICC may thus exercise jurisdiction in a situation where the aforementioned crimes were committed by a State Party national, or in the territory of a State Party, or in a State that has accepted the jurisdiction of the Court. The ICC may also exercise jurisdiction over crimes referred to the ICC Prosecutor by the UN Security Council pursuant to a resolution adopted under chapter VII of the UN Charter. The ICC's exercise of jurisdiction is permitted only if the State where the alleged crimes would otherwise be investigated and prosecuted is unwilling or unable to do so. *Id.* arts. 5, 17.

35. The Prosecutor may apply for an arrest warrant, which a three-member panel of judges must review to determine whether "[t]here are reasonable grounds to believe that the person has committed a crime within the jurisdiction of the Court." *Id.* art. 58(1)(a). An accused person or a State with jurisdiction over a case may challenge the ICC's exercise of jurisdiction. *Id.* art. 19. The ICC has no independent enforcement power and relies on States to arrest individuals who are named in its arrest warrants. *Id.* arts. 59, 89.

36. The Office of the Prosecutor is one of four "organs" that comprise the ICC. It is responsible for examining situations in which international crimes under the jurisdiction of the ICC are alleged to have been committed, carrying out investigations of such situations, and prosecuting individuals who are allegedly responsible for those crimes.

37. Mr. Khan is the current Prosecutor of the ICC and the head of the Office of the Prosecutor. He was elected to that position by vote of the Assembly of States Parties to the Rome Statute, which is comprised of all 125 Member States of the ICC and provides management oversight. *Id.* art. 112.

38. Prior to his election, Mr. Khan served as Special Adviser and Head of the United Nations Investigative Team to Promote Accountability for Crimes Committed by Daesh/ISIL in Iraq, which was established in accordance with United Nations Security Council resolution 2379 (2017) to support efforts to hold ISIL accountable for war crimes, genocide, and crimes against humanity in Iraq.

### The ICC's Investigations

39. Investigations and prosecutions undertaken by the ICC's Office of the Prosecutor—many of which the United States has supported, despite not being a party to the Rome Statute—include, *inter alia*, the following:

40. **Ukraine**: Ukraine accepted the ICC's jurisdiction over alleged crimes occurring on its territory beginning on November 21, 2013. In March 2022, 43 Member States of the United Nations referred the situation in Ukraine to the ICC. The ICC opened an investigation that encompasses allegations of war crimes, crimes against humanity, and genocide committed on the territory of Ukraine.

    a. On April 27, 2022, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[t]he United States welcomes the opening of the investigation by the ICC into atrocity crimes committed in Ukraine, and we intend to engage with all stakeholders to achieve our common objectives in ensuring justice."

    b. In December 2022, Congress passed the FY 2023 Consolidated Appropriations Act, which expanded the authority of the United States to assist the ICC in efforts to prosecute international crimes committed in Ukraine. The Act provides that the United States may "render[] assistance to the International Criminal Court to assist with investigations and prosecutions of foreign

nationals related to the Situation in Ukraine, including to support victims and witnesses." H.R. 2617, 117th Cong. § 7073(b) (2023).

c.  On May 31, 2023, the U.S. Ambassador-at-Large for Global Criminal Justice stated that "[w]e are grateful for the bipartisan legislation Congress has enacted to support the ICC's investigation in Ukraine." The Ambassador further stated that "[h]olding Russia to account for its war crimes and other atrocities within Ukraine and against its people is foundational to the defense of U.S. values and the maintenance of a peaceful, just, and secure world."

d.  The ICC has issued arrest warrants for, among others, Vladimir Vladimirovich Putin, President of the Russian Federation, and Maria Alekseyevna Lvova-Belova, Commissioner for Children's Rights in the Office of the President. The international crimes for which arrest warrants for these individuals have been charged include the forcible transfer and deportation of children from occupied areas of Ukraine to Russia. According to the 2023 edition of the *Digest of United States Practice in International Law*, quoting a public delegate for the U.S. Mission to the UN, "[a]s President Biden noted, we believe the warrants are justified. The United States supports that investigation, as well as a range of other situations before the Court."

41. **Uganda**: In January 2004, the Government of Uganda (a State Party to the Rome Statute) referred the situation in its territory to the ICC, consisting of alleged war crimes and crimes against humanity, including enlistment of children, sexual enslavement, and rape, occurring on its territory since it ratified the Rome Statute in 2002, in the context of an armed conflict between the

Lord's Resistance Army ("LRA") and Uganda.  In July 2004, the Office of the Prosecutor opened an investigation into these alleged crimes.

        a.   In January 2015, the United States played a leading role in facilitating the transfer to the ICC of Dominic Ongwen, a top commander of the LRA.  The Department of State stated that "[t]he United States welcomes [Ongwen's] transfer … by Central African authorities to the International Criminal Court" and that the surrender "give[s] hope—to the survivors, to the four countries affected by the LRA, and to their partners around the world—that the nightmare of the LRA can be brought to an end."

        b.   In February 2021, the State Department "welcome[d] the verdict" against Ognwen as a "a significant step for justice and accountability for atrocities committed by the LRA."

        c.   In December 2022, the State Department "welcomed" the "judgment affirming [Ongwen's] conviction" and expressed "hope" that the "judgment demonstrates that justice must and will be done" for "the thousands of abducted young women and girls subjected to horrific sexual violence, torture, and forced labor in the Lord's Resistance Army."

42. **The Democratic Republic of the Congo**: In March 2004, the Government of the Democratic Republic of the Congo (a State Party to the Rome Statute) referred the situation in its territory to the ICC, consisting of alleged war crimes and crimes against humanity, including the recruitment of child soldiers, rape, and murder, occurring in its territory since it ratified the Rome Statute in April 2002.  In June 2004, the Office of the Prosecutor opened an investigation into these alleged crimes.

a.  One of the defendants, Bosco Ntaganda, surrendered himself to the U.S. Embassy in Rwanda in March 2013, asking to be delivered to the ICC.

b.  The same month, the United States facilitated the transfer of Mr. Ntaganda to the ICC.  The State Department stated that it "welcome[d] the removal of one of the most notorious and brutal rebels in the Democratic Republic of the Congo, Bosco Ntaganda, … to the International Criminal Court."

c.  In November 2013, the State Department stated that the United States had "played a key role in the surrender of Bosco Ntaganda to the ICC."

43. **The Central African Republic**: In December 2004, the Government of the Central African Republic (a State Party to the Rome Statute) referred the situation in its territory to the ICC, consisting of alleged international crimes occurring during an armed conflict between 2002 and 2003.  In May 2007, the Office of the Prosecutor opened an investigation into alleged war crimes and crimes against humanity, including mass rapes and killings.  In May 2014, the Government of the Central African Republic further referred to the ICC the situation regarding the conflict occurring in its territory since August 2012.  The Office of the Prosecutor opened an investigation in September 2014 into alleged war crimes and crimes against humanity committed during that conflict, which had led to thousands of deaths and left hundreds of thousands displaced.

a.  In March 2016, the Department of State expressed the United States' support for "the ICC's investigations in the Central African Republic [(CAR)]" and stated that "we commend CAR's commitment to ensuring accountability for serious crimes, including through its cooperation with the ICC in this matter as well as through domestic efforts to pursue justice."

44. **Sudan**: In March 2005, the UN Security Council, of which the United States is a Permanent Member, referred the situation in the Darfur region of Sudan (which is not a State Party to the Rome Statute) to the ICC.  In June 2005, the Office of the Prosecutor opened an investigation into alleged genocide, war crimes, and crimes against humanity committed in Darfur.

      a.  In 2007, a spokesperson for the State Department stated that the United States "fully support[s] bringing to justice those responsible for crimes and atrocities … that have occurred in Darfur.  We are at a point in the process now where we would call upon the Sudanese Government to cooperate fully with the ICC under the aegis of UN Security Council Resolution 1593.  So, it is now incumbent upon the Government of Sudan, we believe, to cooperate with the ICC."

      b.  Since fighting resumed in April 2023, the Prosecutor indicated in January 2025 that the Office of the Prosecutor expects to request arrest warrants based on investigations into crimes committed since April 2023 in West Darfur.  The United States has welcomed steps taken by the Prosecutor.

45. **Libya**:  In February 2011, the United States voted in favor of United Nations Security Council resolution 1970, which referred the situation in Libya (which is not a State Party to the Rome Statute) to the ICC.  In March 2011, the Office of the Prosecutor opened an investigation into alleged war crimes and crimes against humanity committed by Libyan security forces, including widespread and systematic killings and disappearances.

      a.  Speaking on the occasion of the unanimous United Nations Security Council referral to the ICC, the U.S. Ambassador to the United Nations stated: "[T]he

Security Council has responded to the Libyan people's cry for help. The Council's purpose is clear—to protect innocent civilians."

b. In a subsequent United Nations Security Council session, the United States stated that the referral to the ICC "reflected the importance that the international community attaches to ensuring that those responsible for the widespread and systematic attacks against the Libyan people are held accountable." The United States commended the Office of the Prosecutor, stating that the United States "welcomes the swift and thorough work of the Prosecutor…. The spectre of ICC prosecution is serious and imminent, and should serve as a warning to those around [former Libyan leader Muammar] Al-Qadhafi of the perils of continuing to tie their fate to his."

46. **Mali:** In July 2012, the Government of Mali (which is a State Party to the Rome Statute) referred to the ICC the situation regarding alleged international crimes occurring during the armed conflict in its territory. In January 2013, the Office of the Prosecutor opened an investigation into alleged war crimes committed in Mali since January 2012, including with regard to the destruction of cultural heritage sites in the city of Timbuktu.

a. In October 2015, the State Department stated: "We welcome the announcement by the Prosecutor of the International Criminal Court (ICC) that Ahmad Al Faqi Al Mahdi … has been surrendered to the Court by Nigerien authorities. This is an important step toward holding accountable those responsible for serious crimes in Mali."

b. The State Department further stated: "The United States strongly condemns the destruction of Muslim shrines and other religious and historic sites in Timbuktu

by extremist militants….  We are outraged by the destruction of these World Heritage Sites.  These are assaults not just on Mali and its people, but on the common cultural heritage of all humankind, and those responsible for these acts—and all those responsible for atrocity crimes—should face justice.…  We commend Mali's commitment to ensuring accountability for serious crimes and its cooperation with the ICC in this matter."

c.  In September 2016, the State Department stated: "The United States supports efforts by the ICC and Malian authorities to provide justice for these serious crimes committed in Mali.  We commend Mali for its cooperation with the ICC in this matter, and we encourage continued national and international efforts to bring to justice senior extremist leaders who led the campaign to terrorize northern Mali and destroy symbols of its rich history of tolerance and cultural pluralism."

47. **Republic of Georgia:** In January 2016, the Pre-Trial Chamber of the ICC authorized the Office of the Prosecutor to open an investigation into alleged war crimes and crimes against humanity committed in Georgia, a State Party to the Rome Statute, in the context of Russia's invasion of Georgia in 2008.

a.  In June 2022, the ICC issued arrest warrants for three individuals for allegedly committing the international crimes, including unlawful confinement, torture and inhuman treatment, outrages upon personal dignity, hostage taking, and unlawful transfer of civilians.

b.  In August 2022, the United States Mission to the United Nations expressed its approval of the "decisions of the International Criminal Court of June 2022 to

issue arrest warrants for war crimes committed during Russia's invasion in 2008."

48. **Venezuela:** In 2018, six States Parties to the Rome Statute referred the situation in Venezuela, a Party to the Rome Statute, to the ICC. In February 2020, Venezuela also referred to the ICC the situation regarding alleged crimes occurring in its territory. Two other States Parties to the Rome Statute subsequently referred the situation to the Prosecutor. The Office of the Prosecutor opened an investigation into these alleged crimes in November 2021.

   a. In June 2023, Mr. Khan, as Prosecutor of the ICC, concluded a Memorandum of Understanding with the President of Venezuela outlining a series of priority areas whereby the Office of the Prosecutor would "provide advice and assistance to Venezuelan authorities, in line with the principle of complementarity [with domestic proceedings] at the heart of the Rome Statute."

   b. According to the 2023 edition of the *Digest of United States Practice in International Law*, quoting a public delegate for the U.S. Mission to the UN, the U.S. "welcomed … the Court's reauthorization of the Prosecutor's investigation in Venezuela. Victims of these atrocities continue to demand justice."

49. **Philippines:** In September 2021, the ICC's Pre-Trial Chamber authorized the Office of the Prosecutor to open an investigation into alleged crimes against humanity committed in the Philippines between November 2011 and March 2019 (during the time that the Philippines was a State Party to the Rome Statute), in the context of the Philippines' so-called war on drugs campaign. Following a request by the Philippines for a deferral of the investigation, in January 2023, the Pre-Trial Chamber confirmed that the Prosecutor could continue the investigation.

a. In May 2024, a spokesperson for the U.S. State Department said that "[t]he United States is aware of the ICC's decision to continue their inquiry in the Philippines," adding that the United States "appreciates the openness" of current President Marcos to that investigation.

b. In February 2025, following an application by the Office of the Prosecutor, the ICC's Pre-Trial Chamber issued an arrest warrant against former President Rodrigo Duterte for the crime against humanity of murder which led to his arrest and surrender to the ICC in March 2025.

50. **Myanmar:** In November 2019, the ICC's Pre-Trial Chamber authorized the Prosecutor to proceed with an investigation of the alleged crimes against humanity of deportation and persecution, allegedly committed against the Rohingya population, on the ground that the crimes partially occurred in Bangladesh (a State Party to the Rome Statute).

a. In March 2022, U.S. Secretary of State Antony Blinken "determined that members of the Burmese [Myanmar] military committed genocide and crimes against humanity against Rohingya." The United States has stated it is "committed to justice for victims, survivors and their families, and to accountability for those responsible for past atrocities." In September 2022, the U.S. State Department indicated it would "support a referral of the situation in Burma [Myanmar] to the [ICC]."

b. In November 2024, the Prosecutor filed an application for a warrant of arrest for Senior General and Acting President Min Aung Hlaing, Commander-in-Chief of the Myanmar Defense Services, for the alleged crimes against humanity of deportation and persecution.

51. **Afghanistan**: Following a request by the Prosecutor, in 2020, the ICC's Appeals Chamber authorized an investigation into crimes allegedly committed in Afghanistan (a State Party to the Rome Statute), including those allegedly committed by the Taliban, Afghan security forces, and U.S. personnel.

    a.  In September 2021, Mr. Khan issued a statement expressing his decision "to focus my Office's investigations in Afghanistan on crimes allegedly committed by the Taliban and the Islamic State – Khorasan Province ('IS-K') and to deprioritise other aspects of this investigation," a reference to the investigation of alleged crimes by Afghan and U.S. forces.

    b.  In November 2024, six States Parties referred the situation in Afghanistan to the ICC, expressing concern and requesting an investigation for crimes committed against women and girls after the Taliban takeover in 2021. The United States Mission to the United Nations had previously "condemn[ed] in the strongest terms the Taliban's continued systemic gender discrimination and oppression of women and girls in Afghanistan."

    c.  In January 2025, applications for arrest warrants were announced for senior members of the Taliban for the crime against humanity of persecution on gender grounds committed against women, girls, and members of the LGBTQI+ community since the Taliban takeover.

    d.  No applications for arrest warrants have been announced for U.S. personnel.

52. **Palestine**: In January 2015 and May 2018, Palestine (a State Party to the Rome Statute) accepted the ICC's jurisdiction and subsequently referred the situation to the Prosecutor. In 2021,

following confirmation by the ICC's Pre-Trial Chamber that jurisdiction was proper, the Office of the Prosecutor opened an investigation into the situation in Palestine.

    a. On November 21, 2024, the ICC issued an arrest warrant for Mohammed Al-Masri, the highest commander of the military wing of Hamas, for the alleged international crimes of murder, extermination, torture, rape and other forms of sexual violence, hostage-taking, and outrages upon personal dignity.  The arrest warrant was terminated in February 2025, following confirmation of Mr. Al-Masri's death.  The Office of the Prosecutor also requested arrest warrants for Ismail Haniyeh and Yahya Sinwar, two other senior leaders of Hamas; those requests were withdrawn upon confirmation of their deaths.

    b. Arrest warrants were also issued for Benjamin Netanyahu, Prime Minister of Israel, and Yoav Gallant, former Minister of Defense of Israel, for the alleged war crimes of starvation as a method of warfare, intentionally directing an attack against the civilian population, and the alleged crimes against humanity of murder, persecution, and other inhumane acts.

**Plaintiffs' Interactions with the ICC and its Office of the Prosecutor**

53. As set out below, Plaintiffs have had substantial interactions with the ICC's Office of the Prosecutor, including with Mr. Khan.

*Lisa Davis*

54. In September 2021, Plaintiff Davis was appointed by Mr. Khan to serve as Special Adviser to the Prosecutor on Gender Persecution.  Plaintiff Davis served in this role until January 2024.  In December 2024, Mr. Khan appointed Plaintiff Davis as Special Adviser to the Prosecutor on Gender and Other Discriminatory Crimes.

55. Plaintiff Davis accepted these appointments as Special Adviser on a *pro bono* basis (other than compensation for incidental costs associated with the role, such as travel), serving in a personal capacity and not as a representative of Plaintiff Davis' university or any other institution.

56. Prior to the issuance of Executive Order 14,203, Plaintiff Davis, *inter alia*:

    a. drafted the Office of the Prosecutor's *Policy on the Crime of Gender Persecution*;

    b. provided guidance to each of the country teams within the Office of the Prosecutor regarding investigating, charging, and prosecuting crimes that may amount to gender persecution;

    c. provided advice concerning and contributing to the Prosecutor's applications for arrest warrants for the Supreme Leader of the Taliban, Haibatullah Akhundzada, and the Chief Justice of the "Islamic Emirate of Afghanistan," Abdul Hakim Haqqani, for having perpetrated the crime against humanity of persecution on gender grounds;

    d. trained investigators, analysts, and prosecutors within the Office of the Prosecutor regarding methods for working with victims in a gendered-informed way;

    e. liaised with victim groups to identify individuals willing to provide evidence to the Office of the Prosecutor and facilitated victims' engagement with the Office of the Prosecutor;

    f. conducted evidence reviews for the Office of the Prosecutor;

    g. reviewed and commented on draft legal filings by Office of the Prosecutor staff for submission in proceedings before the ICC's pre-trial and trial chambers;

h.  served on delegations to situation countries to provide local prosecutors and judges training on the crime of gender persecution;

i.  presented in-country training for domestic prosecutors and judges concerning situations under investigation by the Office of the Prosecutor;

j.  served as a member of the ICC's Advisory Committees for the Office of the Prosecutor's *Sexual and Gender-Based Crimes Policy* and *Policy on Children*, participated in review sessions with the lead drafters of those policies, commented on drafts, and assisted in their publication and promotion;

k.  initiated the *Just Security* Blog Post Series on the *Policy on the Crime of Gender Persecution*, featuring eight blog posts by international criminal law experts analyzing the elements of the crime of gender persecution;

l.  organized and spoke at the Office of the Prosecutor's Roundtable on Gender Persecution, which brought civil society organizations to the ICC to participate in a meeting on the crime of gender persecution; and

m.  contributed to the development of an external support base for the work of the Office of the Prosecutor, in part by representing the Office of the Prosecutor at outside speaking engagements and presenting the positions of the Prosecutor.

*Gabor Rona*

57. Prior to the issuance of Executive Order 14,203, Plaintiff Rona, *inter alia*:

a.  submitted an *amicus curiae* brief to the ICC in support of the position of the Office of the Prosecutor that the ICC may exercise jurisdiction over alleged crimes committed in relation to the situation in Afghanistan in cases where

those crimes occurred in third countries that are States Parties to the Rome
Statute;

b. contributed to online journals and blogs about international criminal law,
including the *Just Security* blog, where he wrote in support of positions taken
by the Office of the Prosecutor and made recommendations for the Prosecutor's
investigation of war crimes in Ukraine;;

c. spoke in support of the Office of the Prosecutor as a participant in panels on
international criminal law, including a panel hosted by the Center on National
Security at Fordham Law School about the Prosecutor's investigation of
international crimes committed in Ukraine;

d. discussed ongoing investigations by the Office of the Prosecutor in courses
taught at Cardozo and Columbia Law Schools; and

e. communicated with the Office of the Prosecutor to facilitate the placement of
students in jobs and internships that support the ICC's prosecutions.

## The International Emergency Economic Powers Act

58. IEEPA grants the President certain powers with respect to "any unusual and
extraordinary threat, which has its source in whole or substantial part outside the United States, to
the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). After
a national emergency has been declared in accordance with the National Emergency Act, 50 U.S.C.
§ 1621(a), and IEEPA, the President may "block … regulate … void, prevent or prohibit, any
acquisition, holding, withholding, use, transfer, withdrawal, … dealing in, or exercising any right,
power or privilege with respect to, or transactions involving, any property in which any foreign
country or a national thereof has any interest by any person, or with respect to any property, subject

to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). However, the President may not "regulate or prohibit, directly or indirectly … any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," or the importation or exportation of "any information or informational materials." 50 U.S.C. §§ 1702(b)(1) and (3).

59. The President often exercises this authority under IEEPA by issuing an executive order forbidding the dealing in property, or interests in property, of certain persons, and authorizing federal agencies to "designate" those persons whose property or interests in property may not be dealt in.

60. Designation results in the designated person's inclusion on the Specially Designated Nationals List ("SDN List") maintained by the Office of Foreign Assets Control ("OFAC"), an office of the Department of the Treasury.

61. It is unlawful to violate an Executive Order issued under IEEPA that prohibits dealing in a designated person's property or interests in property. 50 U.S.C. § 1705(a). Those who violate such orders are subject to a civil penalty of the greater of $307,922 or twice the value of the blocked transaction. *See id.*; 31 C.F.R. § 520.701; 85 F.R. 19884 (2020). They are also subject to criminal fines of up to $1,000,000 and, if a natural person, up to 20 years' imprisonment.

62. The threat of enforcement of IEEPA's civil and criminal penalties is intended to, and does in fact, deter persons from interacting with designated persons.

**Executive Order 13,928 (June 11, 2020)**

63. Through this Complaint, Plaintiffs challenge the lawfulness of EO 14,203, issued on February 6, 2025. In pertinent part, Executive Order 14,203 replicates EO 13,928, issued by President Trump on June 11, 2020, during his first administration.

64. EO 13,298 declared a national emergency in connection with ICC investigations that may implicate U.S. personnel or the personnel of certain U.S. allies; specifically, the ICC's "illegitimate assertions of jurisdiction over personnel of the United States and certain of its allies," including the ICC Prosecutor's investigation relating to the United States in Afghanistan. According to EO 13,298, these actions "threaten[ed] to infringe upon the sovereignty of the United States and … thereby threaten[ed] the national security and foreign policy of the United States."

65. Section 3(a) of EO 13,298 prohibited "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person" designated pursuant to the Order. On September 2, 2020, then-Secretary of State Michael Pompeo designated Fatou Bensouda (the then-Prosecutor of the ICC), and Phakiso Mochochoko (the then-head of the ICC's Jurisdiction, Complementarity and Cooperation Division), as foreign persons subject to the sanctions.

66. On October 1, 2020, Plaintiff Rona, among others, filed a complaint against the Trump Administration challenging the lawfulness of EO 13,928.  The complaint raised, *inter alia*, the following causes of action:

      a. The Executive Order violated the First Amendment because it barred the plaintiffs from engaging in speech and advocacy to and in support of the Prosecutor of the ICC, and by subjecting them to civil and criminal penalties for engaging in that speech and advocacy.

      b. The Executive Order violated the Fifth Amendment because it failed to provide the notice required by due process as to what acts were prohibited and thus permitted arbitrary enforcement.

      c. The Executive Order was *ultra vires* because it regulated acts that were exempt from regulation under IEEPA.

67. On October 9, 2020, Plaintiff Rona, as well as the other plaintiffs in that action, moved for a preliminary injunction to prevent the government from enforcing IEEPA's civil or criminal penalty provisions against them.

68. On January 4, 2021, the Court granted the preliminary injunction in part, finding that Plaintiff Rona (and the other plaintiffs in the action) had demonstrated they were likely to succeed on their First Amendment claim.  The Court applied strict scrutiny, having found that the Executive Order and implementing regulations restricted speech based on content.  The Court further found that the restrictions were "not narrowly tailored" because they "prohibit[ed] or chill[ed] significantly more speech than even Defendants seem[ed] to believe is necessary to achieve their end," that is, "to induce [those designated under the Executive Order] to desist from their investigation of U.S. and allied personnel."  *Open Soc'y*, 510 F. Supp. 3d at 212-13.  The Court stated in the alternative that, even if it "applied intermediate scrutiny rather than strict scrutiny, Plaintiffs would likely still prevail because the Order and the Regulations burden substantially more speech than necessary."  *Id.* at 212 n.7.[1]  Defendants did not appeal the Court's Order.

69. On April 1, 2021, President Biden issued Executive Order 14,022, *Termination of Emergency with Respect to the International Criminal Court*, Exec. Order No. 14,022, 86 Fed. Reg. 17895 ("EO 14,022").  This "terminate[d] the national emergency declared in Executive Order 13928 of June 11, 2020 … and revoke[d] that order."  *Id.*  On April 5, 2021, OFAC removed Ms. Bensouda and Mr. Mochochoko from the SDN List.  On April 30, 2021, the Court granted a voluntary dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

---

[1] The Court's partial granting of the motion for a preliminary injunction with respect to EO 13,928 determined that the claims asserted therein concerning the vagueness of provisions of the Order relating to the designation of non-U.S. persons were not ripe.  Unlike the prior action, this action does not assert claims regarding designation under EO 14,203. The Court partial granting of the motion for a preliminary injunction also determined that the claim that EO 13,928 was *ultra vires* under IEEPA was not ripe because Defendants "acknowledged that IEEPA's language is 'clear' and that the Executive Order '"shall be implemented consistent with applicable law."'"  *Open Soc'y*, 510 F. Supp. 3d at 216 (quoting Defendants' opposition to the motion for preliminary injunction and EO 13,928 § 11(b)).  Defendants have not made such an acknowledgement with respect to EO 14,203.

70. EO 14,022 was subsequently "revoked" when President Trump returned to office and issued Executive Order 14,148 on January 20, 2025.  *See* Exec. Order No. 14,148, 90 Fed. Reg. 8237 (Jan. 20, 2025).

## Executive Order 14,203 (February 6, 2025)

71. On February 6, 2025, President Trump issued Executive Order 14,203.  The current action is brought to challenge the lawfulness of that Executive Order.

72. EO 14,203 declares a national emergency with respect to "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction."  EO 14,203, Preamble.  It specifically refers to the ICC's investigation of the Palestine situation, including the arrest warrants issued for Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant.  *Id.*  EO 14,203 also designated "the person listed in the Annex to this order," which was not made public when the Order itself was issued.  EO 14,203, § 1(a)(i).  The Annex was subsequently published, revealing that Mr. Khan, the current Prosecutor of the ICC, was the individual designated.[2]  EO 14,203, § 1(a)(i); *id.*, Annex.  On February 13, 2025, OFAC added Mr. Khan to the SDN List.

---

[2] Section 1(a)(ii) also authorizes the Secretary of State to designate any additional foreign person whom the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determines:

> (A)    to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality;

> (B)    to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity in

73. Section 3(a) of EO 14,203 is substantively identical to Section 3(a) of EO 13,928—that is, the language which this Court determined likely violated the First Amendment. As EO 13,928 had also done, it prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to" the Executive Order. Consequently, engaging in any activity described in Section 3(a) of EO 14,203 in regard to Mr. Khan is unlawful and subjects those who do so to civil and criminal penalties under IEEPA.

74. EO 14,203 does not define key terms that are used in the Executive Order, including: "services to or in support of," and "services by, to, or for the benefit of." Neither OFAC nor any other government agency has issued regulations or guidance interpreting or clarifying these terms.

75. EO 14,203 does not state that its prohibitions do not apply to "information or informational materials," as required under IEEPA § 1705(b)(3). Neither OFAC nor any other government agency has issued regulations or guidance confirming that information or informational materials are exempted.

**The Threats to Plaintiffs of Enforcement of IEEPA's Civil and Criminal Penalties and the Present and Future Chill on Their Protected Speech**

76. Plaintiffs have been injured, and continue to be injured, by the threat of enforcement of IEEPA's civil and criminal penalties for providing services to or for the benefit of Mr. Khan. EO 14,203 inflicts such injury by causing Plaintiffs to discontinue speech they were previously

---

subsection (a)(ii)(A) of this section or any person whose property or interests in property are blocked pursuant to this order; or

(C)        to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property or interests in property are blocked pursuant to this order.

EO 14,203 § 1(a)(ii).

engaging in and causing them to abandon or reconsider speech they had planned to perform before the Executive Order was issued.

77. The speech that Plaintiffs planned to undertake, but which they have abandoned or reconsidered in light of the Executive Order, includes the following:

*Lisa Davis*

78. Plaintiff Davis has stopped interacting with, and providing advice to, Mr. Khan and the Office of the Prosecutor on matters related to gender and other discriminatory crimes in all situations under the ICC's jurisdiction.

79. Plaintiff Davis has stopped advising Mr. Khan and the Office of the Prosecutor about applications for arrest warrants related to gender and other discriminatory crimes.

80. Plaintiff Davis has ceased liaising with victims and witnesses of international crimes for the purpose of supporting ongoing investigations by the Office of the Prosecutor.

81. Plaintiff Davis has stopped developing the draft *Public Principles on Gender Persecution*, which are due to be published this year.  This would have included organizing workshops and consultations in New York and The Hague with stakeholders from around the world to develop those policies.

82. Plaintiff Davis has refrained from pursuing an additional policy paper proposal related to gender and other discriminatory crimes.

83. Plaintiff Davis has adjusted the operational functioning of the Gender Persecution Observatory, hosted within the Human Rights and Gender Justice Clinic at CUNY Law.  The clinic is no longer able to convene expert panel workshops with the relevant employees and Special Advisers of the Office of the Prosecutor.

84. Plaintiff Davis has withdrawn a pending publication, cancelled participation in a relevant podcast, and declined other writing opportunities concerning the Prosecutor's work.

85. These actions would have involved speech concerning situations that do not fall within the purported national emergency described in Executive Order 14,203.

*Gabor Rona*

86. Plaintiff Rona has abandoned plans to submit *amicus curiae* briefs supportive of the Office of the Prosecutor.

87. Plaintiff Rona has abandoned plans to write blog posts and articles on areas of his expertise relating to the work of the ICC, including on topics he had previously written about, such as ongoing investigations by the Office of the Prosecutor.

88. Plaintiff Rona has discontinued communications with the Office of the Prosecutor concerning the placement of students in jobs and internships to assist ICC prosecutions.

89. Plaintiff Rona has reconsidered whether and how to discuss the Office of the Prosecutor and its investigations and prosecutions in his courses, speaking engagements, and scholarship. For example, he no longer expresses certain opinions about the ICC's role out of fear that his speech would be construed as supportive of Mr. Khan and subject him to enforcement pursuant to Executive Order 14,203.

90. These actions would have involved speech concerning situations that do not fall within the purported national emergency described in Executive Order 14,203.

\* \* \*

91. Both Plaintiffs have discontinued, abandoned, or reconsidered acts that would have involved the transmission of information or informational materials from the United States to a foreign country.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Free Speech Clause of the First Amendment to the U.S. Constitution**

92. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

93. Executive Order 14,203 violates the First Amendment by barring Plaintiffs from engaging in speech to support the ICC's Office of the Prosecutor, including the Prosecutor, and by subjecting Plaintiffs to the prospect of civil or criminal penalties for engaging in that speech.

**COUNT II**
**Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution**

94. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

95. Executive Order 14,203's term "services by, to, or for the benefit of" violates the Fifth Amendment because it provides no notice to Plaintiffs as to what acts are prohibited and permits arbitrary enforcement of the Executive Order.

**COUNT III**
***Ultra Vires* Action under IEEPA, 50 U.S.C. §§ 1701 *et seq.***

96. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

97. IEEPA does not authorize the President to "regulate or prohibit, directly or indirectly … the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."  50 U.S.C. § 1702(b)(3).

98. Plaintiffs' past and planned future acts include the importation and/or exportation of "information or informational materials" within the meaning of IEEPA.

99. Executive Order 14,203 is *ultra vires* because it regulates or prohibits, and authorizes Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Executive Order 14,203 violates the First and Fifth Amendments to the United States Constitution and is *ultra vires* under IEEPA;

B.     Preliminarily and permanently enjoin Defendants from enforcing IEEPA's civil or criminal penalty provisions against them;

C.     Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

D.     Grant such other relief as the Court may deem just and proper.

Dated: April 15, 2025                              Respectfully submitted,

                                                   **GABOR RONA AND LISA DAVIS**

                                                   By their attorneys,

                                                   <u>/s/ Nicholas M. Renzler</u>
                                                   Andrew B. Loewenstein (*pro hac vice* to be
                                                       submitted)
                                                   Christopher Hart (*pro hac vice* to be submitted)
                                                   Ariella Katz Miller (*pro hac vice* to be submitted)
                                                   FOLEY HOAG LLP
                                                   Seaport West
                                                   155 Seaport Boulevard
                                                   Boston, MA 02210
                                                   617-832-1000
                                                   aloewenstein@foleyhoag.com
                                                   chart@foleyhoag.com
                                                   arkatz@foleyhoag.com

                                                   Nicholas M. Renzler (NR1608)
                                                   Hannah E. Sweeney (pending admission)
                                                   FOLEY HOAG LLP
                                                   1301 Avenue of the Americas
                                                   New York, NY 10019
                                                   212-812-0400
                                                   nrenzler@foleyhoag.com
                                                   hsweeney@foleyhoag.com

                                                   James A. Goldston (2327435)
                                                   Esti T. Tambay (ET2721)
                                                   Genevieve B. Quinn (GQ9239)
                                                   OPEN SOCIETY FOUNDATIONS
                                                   Open Society Justice Initiative
                                                   224 West 57th Street
                                                   New York, NY 10019, United States
                                                   212-548-0600
                                                   james.goldston@opensocietyfoundations.org
                                                   esti.tambay@opensocietyfoundations.org
                                                   genevieve.quinn@opensocietyfoundations.org

                                                   *Counsel for Plaintiffs*