UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GABOR RONA and LISA DAVIS,

                    Plaintiffs,

         v.

DONALD J. TRUMP, et al.,

                    Defendants.

No. 25 Civ. 3114 (JMF)

**Defendants' Memorandum of Law in Opposition to
Plaintiffs' Motion for Preliminary Injunction**

JAY CLAYTON
United States Attorney for the Southern
District of New York
86 Chambers Street, Third Floor
New York, New York 10007
(212) 637-2822

ALYSSA B. O'GALLAGHER,
BENJAMIN H. TORRANCE,
Assistant United States Attorneys,
        Of Counsel

**Table of Contents**

**Page**

Preliminary Statement.................................................................................................. 1

Background ................................................................................................................... 2

    A.   The International Emergency Economic Powers Act ........................................ 2

    B.   Executive Order No. 13,928 and *OSJI v. Trump* ............................................. 4

    C.   Executive Order 14,203 ................................................................................... 5

    D.   Plaintiffs' Lawsuit.......................................................................................... 8

ARGUMENT ............................................................................................................... 9

    A.   Legal Standard ............................................................................................... 9

    B.   Plaintiffs Cannot Show a Likelihood of Success on the Merits of Any of Their Claims . 10

        1. Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim ..................... 11

        2. Plaintiffs Are Not Likely to Succeed on Their Vagueness Claim ................................ 17

        3. Plaintiffs Are Not Likely to Succeed on Their "*Ultra Vires*" Claim............................ 19

    C.   Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief.............................................................................................. 22

    CONCLUSION............................................................................................................ 23

## Table of Authorities

Page

*Cases:*

Al Haramain Islamic Foundation v. Department of the Treasury,
    686 F.3d 965 (9th Cir. 2012) ................................................................ 17

Alexander v. Sandoval,
    532 U.S. 275 (2001) .................................................................... 19, 20

Andrews v. Warden,
    958 F.3d 1072 (11th Cir. 2020) ............................................................ 13

Arcara v. Cloud Books, Inc.,
    478 U.S. 697 (1986) ........................................................................ 14

Bank Markazi v. Peterson,
    578 U.S. 212 (2016) ........................................................................ 15

Benihana, Inc. v. Benihana of Tokyo, LLC,
    784 F.3d 887 (2d Cir. 2015) ................................................................ 10

Cannon v. Univ. of Chicago,
    441 U.S. 677 (1979) ........................................................................ 20

Capital Cities/ABC, Inc. v. Brady,
    740 F. Supp. 1007 (S.D.N.Y. 1990) ...................................................... 22

Church of Am. Knights of the Ku Klux Klan v. Kerik,
    356 F.3d 197 (2d Cir. 2004) ................................................................ 14

Copeland v. Vance,
    893 F.3d 101 (2d Cir. 2018) ................................................................ 19

Dames & Moore v. Regan,
    453 U.S. 654 (1981) ......................................................................... 2

El-Ganayni v. U.S. Dep't of Energy,
    591 F.3d 176 (3d Cir. 2010) ................................................................ 13

Emergency Coal. to Defend Educational Travel v. U.S. Dep't of the Treasury,
    545 F.3d 4 (D.C. Cir. 2008) ................................................................ 16

Franklin v. Massachusetts,
    505 U.S. 788 (1992) .................................................................... 20, 21

G.K. Ltd. Travel v. City of Lake Oswego,
    436 F.3d 1064 (9th Cir. 2006) .............................................................. 15

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ................................................................................. 10

*Haig v. Agee,*
    453 U.S. 280 (1981) .......................................................................................... 15

*Hobbs v. County of Westchester,*
    397 F.3d 133 (2d Cir. 2005) ............................................................................. 11

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ....................................................................................... passim

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002) .................................................................... 22

*Jordan v. De George,*
    341 U.S. 223 (1951) .......................................................................................... 18

*Kadi v. Geithner,*
    42 F. Supp. 3d 1 (D.D.C. 2012) ................................................................. 14, 18

*Kester v. Campbell,*
    652 F.2d 13 (9th Cir. 1981) ........................................................................ 13, 17

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner,*
    647 F. Supp. 2d 857 (N.D. Ohio 2009) ............................................................ 19

*Kiobel v. Royal Dutch Petroleum Co.,*
    621 F.3d 111 (2d Cir. 2010) ............................................................................... 6

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) .......................................................................................... 13

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) .......................................................................................... 15

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .......................................................................................... 10

*Metromedia, Inc. v. City of San Diego,*
    453 U.S. 490 (1981) .......................................................................................... 15

*Milena Ship Mgmt. Co. v. Newcomb,*
    804 F. Supp. 846 (E.D. La. 1992) .................................................................... 23

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ............................................................................................ 20

*Munaf v. Geren,*
   553 U.S. 674 (2008)..................................................................................... 9

*N.Y. Progress & Protection PAC v. Walsh,*
   733 F.3d 483 (2d Cir. 2013)....................................................................... 23

*Nixon v. Fitzgerald,*
   457 U.S.  (1982)........................................................................................ 21

*Open Society Justice Initiative v. Trump,*
   510 F. Supp. 3d 198 (S.D.N.Y. 2021)................................................ 5, 13, 20, 21

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)........................................................................... 11, 13, 15

*Regan v. Wald,*
   468 U.S. 222 (1984)................................................................................. 2, 8, 16

*Schickel v. Dilger,*
   925 F.3d 858 (6th Cir. 2019) ..................................................................... 14

*Stagg P.C. v. U.S. Dep't of State,*
   15 Civ. 8468, 2019 WL 1863418 (S.D.N.Y. Apr. 25, 2019).................... 11

*Sussman v. Crawford,*
   488 F.3d 136 (2d Cir. 2007)................................................................... 10, 11

*Teague v. Reg'l Comm'r of Customs, Region II,*
   404 F.2d 441 (2d Cir. 1968)....................................................................... 16

*Udall v. Tallman,*
   380 U.S. 1 (1965)....................................................................................... 13

*United States v. Amirnazmi,*
   645 F.3d 564 (3d Cir. 2011)................................................................. 3, 14, 22

*United States v. Homa Int'l Trading Corp.,*
   387 F.3d 144 (2d Cir. 2004)....................................................................... 18

*United States v. Lindh,*
   212 F. Supp. 2d 541 (E.D. Va. 2002) ........................................................ 18

*United States v. South Carolina,*
   720 F.3d 518 (4th Cir. 2013) ..................................................................... 22

*United States v. Williams,*
   553 U.S. 285 (2008)............................................................................... 18, 19

*Velazquez v. Legal Servs. Corp.*,
    164 F.3d 757 (2d Cir. 1999)............................................................................................... 10

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)...................................................................................................... 19

*VIP of Berlin, LLC v. Town of Berlin*,
    593 F.3d 179 (2d Cir. 2010)........................................................................................... 18

*Winter v. NRDC*,
    555 U.S. 7 (2008)................................................................................................... 10, 23

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010)........................................................................... 15, 16

*Statutes:*

50 U.S.C. § 1701................................................................................................................ 2

50 U.S.C. § 1702(b)(3)............................................................................................ 3, 12, 21

50 U.S.C. § 1705(b)............................................................................................................ 4

50 U.S.C. § 4305(b)(1)(B)................................................................................................... 2

Pub. L. No. 107-206............................................................................................................ 6

*Regulations:*

31 C.F.R. part 500.............................................................................................................. 8

31 C.F.R. part 501.............................................................................................................. 4

31 C.F.R. § 501.801............................................................................................................ 8

31 C.F.R. § 560.210.......................................................................................................... 22

31 C.F.R. § 582.205.......................................................................................................... 22

International Criminal Court-Related Sanctions Regulations, 85 Fed. Reg. 61,816 ..................... 8

*Executive Orders:*

Exec. Order 13,219, 66 Fed. Reg. 34,777............................................................................ 3

Exec. Order 13,382, 70 Fed. Reg. 38,567............................................................................ 3

Exec. Order 13,581, 76 Fed. Reg. 44,757.......................................................................... 18

Exec. Order 13,928, 85 Fed. Reg. 36,139.................................................................. passim

Exec. Order 14,059, 86 Fed. Reg. 71,549.......................................................................... 18

Exec. Order 14,203, 90 Fed. Reg. 9369..................................................................... passim

Defendants respectfully submit this memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction.

**Preliminary Statement**

Executive Order 14,203, "Imposing Sanctions on the International Criminal Court" (the "EO"), issued on February 6, 2025, declares a national emergency with respect to the efforts of the International Criminal Court ("ICC") to investigate and prosecute the personnel of the United States and its allies without those nations' consent, and provides authority to designate foreign persons for sanctions in connection with those efforts. At present, the restrictions in this Order apply only to the ICC's Prosecutor, Karim Khan, who has been listed in the Annex to the Order by the President. As a result of this listing, Plaintiffs, two individual U.S. citizens, may not deal in Khan's property or interests in property, including by providing goods, funds, or services to him or for his benefit or receiving the same from him. Plaintiffs filed this suit alleging that the EO is a content-based prohibition infringing on their First Amendment speech rights, contains several terms that are unconstitutionally vague, and is *ultra vires* because it regulates conduct that is covered by an exemption to the statutory authority under which the President issued this EO.

Plaintiffs' motion for a preliminary injunction—a "drastic remedy"—should be denied because Plaintiffs cannot show they have a substantial likelihood of prevailing on any of these claims. Plaintiffs' as-applied First Amendment claim fails because the EO is a content-neutral restriction of conduct that is narrowly tailored to compelling governmental national-security and foreign-policy interests. None of the terms in the EO that Plaintiffs challenge are unconstitutionally vague, as they provide fair notice of what conduct is prohibited. Finally,

Plaintiffs have no private right of action to bring an "*ultra vires*" challenge to the EO, but such a claim would fail in any event because the EO is fully consistent with the relevant statutory text.

## Background

### A.   The International Emergency Economic Powers Act

For nearly its entire history, the United States has utilized economic sanctions as a tool of foreign policy and national security. In much of the 20th century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301 *et seq.*). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. 50 U.S.C. § 4305(b)(1)(B); *Dames & Moore v. Regan,* 453 U.S. 654, 672 (1981).

In 1977, Congress amended TWEA and enacted the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, to delineate "the President's authority to regulate international economic transactions during wars or national emergencies," S. Rep. No. 95-466 at 2, *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars and to certain existing TWEA programs, with IEEPA available during other times of declared national emergency. *Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Under IEEPA, the President may declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Similar to TWEA, IEEPA authorized the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any

> interest by any person, or with respect to any property, subject to the jurisdiction of
> the United States . . . .

*Id.* § 1702(a)(1)(B). In addition, the National Emergencies Act, 90 Stat. 1255 (1976) (codified as

amended at 50 U.S.C. §§ 1601-1651), established procedures for regular congressional review

over a President's national emergency declarations.

IEEPA includes several exemptions to the President's authority, including that the

President may not "regulate or prohibit, directly or indirectly . . . the importation from any

country, or the exportation to any country, whether commercial or otherwise, regardless of

format or medium of transmission, of any information or informational materials including but

not limited to, publications, films, posters, phonograph records, photographs, microfilms,

microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C.

§ 1702(b)(3). This exclusion, which Congress added to IEEPA in 1988 and amended in 1994, is

part of what is commonly known as the "Berman Amendment." *United States v. Amirnazmi*, 645

F.3d 564, 584-86 (3d Cir. 2011).

Presidents have blocked persons under sanctions programs based on IEEPA in response

to a variety of declared national emergencies. *See, e.g.*, Exec. Order No. 13,382, 70 Fed. Reg.

38,567 (June 28, 2005) (blocking the property and interests in property of persons who, among

other things, are determined to have engaged in transactions that have materially contributed to

the proliferation of weapons of mass destruction); Exec. Order No. 13,219, 66 Fed. Reg. 34,777

(June 26, 2001) (listing individual persons as blocked). In general, persons who are listed or

designated under an IEEPA-based sanctions program are added to the List of Specially

Designated Nationals and Blocked Persons (the "SDN List"), which is administered by the U.S.

Department of the Treasury's Office of Foreign Assets Control ("OFAC").[1] Persons on the SDN List have their assets subject to U.S. jurisdiction "blocked" (*i.e.*, frozen) and U.S. individuals and entities are generally prohibited from dealing in them. *See* 50 U.S.C. § 1705(b) (civil penalties), *id.* § 1705(c) (criminal penalties).[2]

**B.    Executive Order No. 13,928 and *OSJI v. Trump***

On June 11, 2020, President Trump issued Executive Order No. 13,928, in which he found that "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States," and invoked IEEPA to declare a national emergency with respect to that threat. *See* Exec. Order No. 13,928, Blocking Property of Certain Persons Associated With the International Criminal Court, 85 Fed. Reg. 36,139 (2020), Preamble. The preamble of Executive Order 13,928 explains that the emergency stems from the ICC's "illegitimate

---

[1] *See* OFAC, Specially Designated Nationals and Blocked Persons List, https://www.treasury.gov/sdn.

[2] When determining whether to issue a civil penalty, OFAC follows a set process outlined in the agency's regulations. *See generally* 31 C.F.R. part 501, App. A, Economic Sanctions Enforcement Guidelines. OFAC begins by reviewing the "facts and circumstances surrounding an apparent violation," then applies a set of General Factors to determine whether to initiate a civil penalty proceeding and, where applicable, to determine the appropriate amount of a civil monetary penalty. *Id.* § 501, App. A(V). The General Factors OFAC considers include whether any apparent violation was willful or reckless, the subject person or entity's awareness of the conduct, involvement of senior management in the conduct, harm to the sanctions program objectives, and individual factors such as the commercial sophistication and size of the subject person or entity. *Id.* § 501, App. A(III). Depending on the facts and circumstances of particular cases, OFAC may determine after investigation, among other outcomes, that no response is warranted (because, for example, the conduct does not rise to a level warranting a response); that additional information is needed; that a cautionary letter should be issued; or that a violation occurred. *Id.* § 501, App. A(II).

assertions of jurisdiction over personnel of the United States and certain of its allies, including the ICC Prosecutor's investigation into actions allegedly committed by United States military, intelligence, and other personnel in or relating to Afghanistan." *Id.*

The plaintiffs in *Open Society Justice Initiative v. Trump* ("*OSJI*") (who included current Plaintiff Rona) challenged Executive Order 13,928, and the district court there enjoined the government "from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs for conduct specifically addressed in Plaintiff's [*sic*] Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of Executive Order 13,928." 510 F. Supp. 3d 198, 217 (S.D.N.Y. 2021). Specifically, the court ruled that the plaintiffs in *OSJI* were likely to prevail on their First Amendment claims, because Executive Order 13,928 restricted the plaintiffs' speech; that restriction was content-based and therefore subject to strict scrutiny; and the Executive Order was not narrowly tailored to a compelling government interest because it restricted more speech than necessary to achieve its ends. *Id.* at 209-13. At the same time, the district court held that the plaintiffs were not likely to succeed on their claims that the Executive Order was unconstitutionally vague or was *ultra vires*. *Id.* at 208-09, 213-16.

President Biden revoked Executive Order 13,928, and the *OSJI* case was then dismissed without prejudice.

**C.  Executive Order 14,203**

On February 6, 2025, President Trump issued Executive Order 14,203. 90 Fed. Reg. 9369 (2025). The President found in this EO that "any effort by the ICC to investigate, arrest, detain, or prosecute" U.S. persons, including members of the Armed Forces and government officials and employees, or citizens and residents of U.S.-allied nations without that nation's consent,

constitutes "an unusual and extraordinary threat to the national security and foreign policy of the United States" and again declared a "national emergency to address that threat." EO Preamble. The EO states that the ICC "has engaged in illegitimate and baseless actions targeting America and our close ally Israel," and "without a legitimate basis[] asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel," and "issu[ed] baseless arrest warrants targeting" Israeli government officials. EO Preamble.

Executive Order 14,203 is part of a long string of actions taken by the United States related to its concern that the ICC infringes upon the United States' sovereignty and threatens to impede the critical national-security and foreign-policy work of the United States and certain of its allies, thereby threatening United States' national-security and foreign-policy interests. *See id.*; *see also* Exec. Order No. 13,928 Preamble.  The Executive Order is also consistent with the United States' long history of objecting to the ICC's assertions of jurisdiction over U.S. personnel, as the United States has never ratified the Rome Statute (the treaty establishing the ICC) and thus has never undertaken any obligations related to the ICC, nor has it agreed to subject its citizens to the ICC's jurisdiction. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 119 n.16 (2d Cir. 2010) (describing U.S. decision to "un-sign" the Rome Statute). In 2002, the same year the ICC was established, Congress passed the American Service-Members' Protection Act ("ASPA"), Pub. L. No. 107-206 (codified at 22 U.S.C. § 7421 *et seq.*), which prohibits several forms of cooperation between the United States and the ICC.

Concerns about the risks to U.S. persons posed by the ICC became more pronounced in 2020 after the ICC Prosecutor requested authority to investigate alleged war crimes, including by U.S. personnel, committed during the war in Afghanistan. Such concerns about the national-security risks to the United States and its allies posed by the ICC continued with the ICC's 2024

6

commencement of investigations into certain U.S. allies, such as Israel, which have not

consented to the ICC's jurisdiction. Executive Order 14,203 is a direct response to the ICC

Prosecutor's continued pursuit of an investigation and attempt to assert jurisdiction over the

United States and its allies, and additionally restates the U.S. Government's longstanding

concerns about the ICC noted above.

The President identified Karim Khan, the ICC Prosecutor, as subject to specified

sanctions in the Annex to Executive Order 14,203, and authorized the Secretary of State, in

consultation with the Secretary of the Treasury and the Attorney General, to designate additional

foreign persons who meet certain criteria. Exec. Order 14,203 § 1.[3] Specifically, under Section 1,

the Secretary of State may designate foreign persons determined to have "directly engaged in any

effort by the ICC to investigate, arrest, detain, or prosecute" any person protected by the EO

without the consent of that person's country of nationality. *Id.* § 1(a)(ii)(A). That section of the

EO also authorizes the designation of foreign persons determined to have "materially assisted,

sponsored, or provided financial, material, or technological support for, or goods or services to or

in support of, any activity in [§ 1(a)(ii)(A)]" or any person designated under the EO.[4] *Id.*

§ 1(a)(ii)(B).

Executive Order 14,203 states that "[a]ll property and interests in property that are in the

United States, that hereafter come within the United States, or that are or hereafter come within

---

[3] A "foreign person" is defined to mean "not a United States person," i.e., someone who is not a "United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including a foreign branch, subsidiary, or employee of such entity), or any person lawfully in the United States." EO 14,203 § 8(c), (h).

[4] The EO also authorizes the designation of foreign persons who are determined to be "owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order." EO 14,203, § 1(a)(ii)(C).

the possession or control of any United States person," of designated or blocked persons, "may not be transferred, paid, exported, withdrawn, or otherwise dealt in." *Id.* § 1(a). Section 3 of the EO specifies that this prohibition includes the making "of any contribution or provision of funds, goods, or services by, to, or for the benefit of any" person designated pursuant to the EO, or the receipt of such funds, goods, or services from such person. *Id.* § 3(a), (b). Accordingly, absent an applicable exception or authorization, U.S. persons are prohibited from providing funds, goods, or services to, or for the benefit of, a designated or otherwise blocked person.

The EO authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to "employ all powers granted to the President by IEEPA," to promulgate rules and regulations to carry out the purposes of the EO, and to re-delegate such functions within the Department of the Treasury. EO § 10. To date, the Treasury Department has not yet issued implementing regulations.[5]

### D.   Plaintiffs' Lawsuit

In this case, Plaintiffs, two U.S.-citizen law professors who have interacted with the ICC in the past, seek a declaration that the EO is unconstitutional and *ultra vires* under IEEPA, and move the Court for an order enjoining the Government from enforcing IEEPA's prohibitions against them. Complaint ("Compl."), Dkt. No. 1 ¶ 16 & Prayer for Relief.

---

[5] OFAC has promulgated recordkeeping and procedural regulations applicable to all U.S. sanctions programs. 31 C.F.R. part 500; *see Regan*, 468 U.S. at 226 n.2. These regulations permit persons, including designated or blocked persons, to seek licenses from OFAC for authorization to engage in otherwise prohibited activities. 31 C.F.R. § 501.801.

As OFAC previously stated in connection with Executive Order 13,928, implementing regulations specific to Executive Order 14,203 "may include additional interpretive and definitional guidance, general licenses, and statements of licensing policy." International Criminal Court-Related Sanctions Regulations, 85 Fed. Reg. 61,816 (Oct. 1, 2020).

According to Plaintiffs' motion papers, before the EO was issued, they "provid[ed] education, advice, training, information, analysis, and other services to or for the benefit of" the ICC's Prosecutor. Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, Dkt. 17 ("Mot.") at 1. Specifically, Plaintiff Rona previously submitted an amicus brief in support of the Prosecutor to the ICC, and wrote and spoke in various forums supporting the Prosecutor's investigations. Mot. at 12-13. Plaintiff Davis was a special advisor to the Prosecutor on gender-based crimes; Davis drafted policy and guidance documents for the Prosecutor's office, provided training for that office's staff and to domestic prosecutors regarding the Prosecutor's investigations, and facilitated victims' communications with the Prosecutor's office. Mot. at 13-14.

Plaintiffs bring three claims. In Count One, Plaintiffs allege that the EO violates the First Amendment's protection of the freedom of speech. Compl. ¶ 93. In Count Two, Plaintiffs allege that the EO violates the Due Process Clause of the Fifth Amendment because terms used in the EO are vague and thus provide Plaintiffs with insufficient notice of what conduct the EO prohibits. *Id.* ¶ 95. In Count Three, Plaintiffs allege that the EO is *ultra vires* because it regulates or prohibits acts that are expressly excluded from the scope of the President's authority by the Berman Amendment. *Id.* ¶¶ 97-99.

On April 15, 2025, Plaintiffs filed their motion seeking a preliminary injunction. Dkt. No. 16.

## ARGUMENT

### A.   Legal Standard

A preliminary injunction is "an extraordinary and drastic remedy," which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal quotation marks omitted).

Ordinarily, a party seeking a preliminary injunction must demonstrate:

(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks and alteration omitted). Here, however, Plaintiffs' "burden is . . . increased because the preliminary injunction [they] seek is against the government. . . . [W]here a preliminary injunction is sought against the enforcement of governmental rules, the movant may not invoke the 'fair ground for litigation standard' but must show 'likelihood of success.' " *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 763 (2d Cir. 1999), *aff'd*, 531 U.S. 533 (2001). Under this "more rigorous" standard, "plaintiffs must establish a clear or substantial likelihood of success on the merits." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (internal quotation marks omitted).

The movant bears the burden of demonstrating by "a clear showing" that the remedy is necessary and that the prerequisites for issuance of the relief are satisfied. *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "That is because the preliminary injunction is one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

**B.    Plaintiffs Cannot Show a Likelihood of Success on the Merits of Any of Their Claims**

None of Plaintiffs' claims give rise to the required "clear or substantial likelihood of success on the merits," and thus Plaintiffs cannot make the required showing that they are

entitled to injunctive relief. *Sussman*, 488 F.3d at 139-40. Plaintiffs' request for a preliminary injunction should be denied on this basis alone.

**1.    Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim**

    **a.    Strict Scrutiny Does Not Apply Because the EO Is Content Neutral**

A speech restriction is content-based if it "on its face draws distinctions based on the message a speaker conveys . . . , cannot be justified without reference to the content of the regulated speech, or [was] adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (internal quotation marks omitted). None of those are true here.

Plaintiffs argue that the EO imposes content-based restrictions "because whether Plaintiffs may speak 'depends on what they say.' " Mot. at 16 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010)). That is not the case. The EO prohibits Plaintiffs from dealing in the property or interests in property of the ICC Prosecutor, Karim Khan, including by providing "funds, goods, or services" to him or for his benefit. EO §§ 1(a), 3(a). On their face, these restrictions do not implicate speech, and are content-neutral as they draw no distinction based on the message or content of the funds, goods, or services provided. *See Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) ("Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.' "); *Stagg P.C. v. U.S. Dep't of State*, 15 Civ. 8468 (KPF), 2019 WL 1863418, at *8 (S.D.N.Y. Apr. 25, 2019) (regulations defining regulated speech based on the source and destination of information were not content-based).

Plaintiffs argue that they are "forbidden from engaging in speech that constitutes" services that benefit Khan, and therefore speech (including amicus curiae briefs to the ICC) that "has the function or purpose of benefitting" Khan or his investigations and prosecutions is

proscribed, while speech "that takes a contrary view" is allowed—constituting both a content- and viewpoint-based restriction. Mot. at 16-17. However, absent facts that do not apply here, such as that a brief was drafted at the specific request of and in coordination with Khan, the submission of an amicus curiae brief to the ICC is not prohibited by the EO regardless of the brief's content.

Indeed, the Government has expressly and publicly stated that sanctions such as those contemplated by the EO do not apply to persons engaging in "activities subject to U.S. constitutional protection, such as protected speech," nor is any authorization from the Government needed to engage in those activities. OFAC, Frequently Asked Question (FAQ) No. 1190, https://ofac.treasury.gov/faqs/1190; *see also* Letter from OFAC Acting Director to Found. for Global Political Exchange, Nov. 8, 2024, https://perma.cc/MV2U-4QGK (noting OFAC's determination that "including sanctioned persons as speakers" at conference and "actions ordinarily incident to facilitating their participation as speakers" under described circumstances "is not a service prohibited by U.S. sanctions, and thus no authorization is necessary"). That interpretation is consistent with, and reinforces, the Berman Amendment to IEEPA, which prohibits the Government from using that statute to "regulate or prohibit, directly or indirectly" the exchange of "any information or informational materials." 50 U.S.C. § 1702(b)(3); *see* FAQ No. 1190 (noting that "additional limitations and authorizations are in place to ensure that U.S. sanctions do not restrict the exchange of information or informational materials, or personal communication"). And to ensure clarity, OFAC explicitly invites any person concerned about the effect of sanctions to contact the agency for guidance. FAQ No. 1190.

The district court in *OSJI* reasoned that the text of Executive Order 13,928, "does not plainly compel" that interpretation, because "[a]micus curiae briefs that express support for the actions and litigating positions of [the ICC Prosecutor] potentially benefit [him] in cases before

the ICC." 510 F. Supp. 3d at 210 n.5. But the Government's "reasonable interpretation" of an Executive Order, even if it is not the "only one permitted by the language" of the Order, is entitled to courts' "respect." *Udall v. Tallman*, 380 U.S. 1, 4 (1965); *accord Andrews v. Warden*, 958 F.3d 1072, 1078 (11th Cir. 2020) ("deference should be accorded to an executive agency's interpretation of an executive order it is charged with administering"); *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 187 (3d Cir. 2010) ("great deference" (internal quotation marks omitted)); *Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981) ("In light of an agency's presumed expertise in interpreting executive orders charged to its administration, we review such agency interpretations with great deference."); *see Kisor v. Wilkie*, 588 U.S. 558, 580 (2019) (courts should "defer[] to reasonable agency constructions of ambiguous rules"). Here, the Government's clear statements that EO 14,203's sanctions will not apply to protected speech are entitled to judicial deference.

Even to the extent the EO affects speech, it was adopted to address the Government's national-security concerns, not because of a disagreement with a certain message, and it is justified without any reference to the content of incidentally regulated speech. *See Reed*, 576 U.S. at 163-64. As described further below, the purpose of the EO is to protect the personnel of the United States and its allies from ICC investigations and prosecutions by deterring certain persons who are assisting the ICC in these efforts. This is not an effort to censor certain speech or a certain viewpoint. Indeed, "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004); *accord Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986); *Amirnazmi*, 645 F.3d at 584 ("a statute is not overly broad and thus violative of the First Amendment merely because it regulates incident to its scheme protected activities or property"; rejecting challenge to TWEA

and IEEPA sanctions (internal quotation marks and alteration omitted)). The prohibition on

transactions with Khan, a standard consequence of the imposition of sanctions, is aimed at

addressing the Government's national-security concerns with the ICC's targeting of "protected

persons." Plaintiffs are free to speak openly, or publish widely, in opposition to this foreign

policy, as confirmed by OFAC's affirmation in FAQ No. 1190 that it does not sanction persons

who engage in constitutionally protected speech. *See Schickel v. Dilger*, 925 F.3d 858, 876 (6th

Cir. 2019) ("Kentucky's gift ban provision, however, serves an anticorruption purpose unrelated

to the content of expression and is justified without any reference to the content of the gifts

regulated."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 34 (D.D.C. 2012) (applying intermediate

scrutiny and noting that "the designation of Kadi as a [specially designated global terrorist] and

the blocking of his assets merely restricts his ability to make financial transfers to other SDGTs,

not his ability to express his views generally.")

      **b.**     **The EO Satisfies Both Intermediate Scrutiny and Strict Scrutiny**

Because the EO is content-neutral and only incidentally burdens expression, intermediate

scrutiny applies. A regulation survives intermediate scrutiny so long as it "advances important

governmental interests unrelated to the suppression of free speech and does not burden

substantially more speech than necessary to further those interests." *Humanitarian Law Project*,

561 U.S. at 26-27 (internal quotation marks omitted). However, even if the Court were to

conclude that the more demanding strict scrutiny standard applies instead, the EO also satisfies

that standard. Under strict scrutiny, a regulation survives if it "furthers a compelling interest and

is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171.

The EO serves a governmental interest that is both "important" and "compelling"—

protecting the personnel of the United States and its allies from investigation, arrest, detention,

and prosecution by the ICC without the consent of the United States or its allies. These are

"sensitive and weighty interests of national security and foreign affairs" that constitute critically important governmental interests for purposes of a First Amendment analysis. *Humanitarian Law Project*, 561 U.S. at 33-34; *see Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (IEEPA blocking regime allows President to "best further[] the United States' foreign-relations and national-security interests" (internal quotation marks omitted)); *Haig v. Agee*, 453 U.S. 280, 307 (1981) ("no governmental interest is more compelling than the security of the Nation").[6] Notably, in their motion papers, Plaintiffs offer no basis to doubt the importance of the national-security and foreign-policy concerns discussed in the EO. *See* Mot. at 18. Nor could they. *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 157-58 (D.D.C. 2010) (declining "to adjudicate such matters of strategy and tactics relating to the conduct of foreign policy, which 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.' " (quoting *Regan*, 468 U.S. at 242)).

The EO also satisfies the applicable tailoring standards under either level of scrutiny. Plaintiffs argue that the EO is overbroad because it prohibits providing assistance of any kind to Khan, while the declared national emergency is limited to the investigation, arrest, detention, or prosecution by the ICC of "U.S. persons and persons of certain allied countries without their consent." Mot. at 18-19. But Plaintiffs misunderstand how U.S. sanctions authorities are designed to work. Sanctions authorities such as those in the EO allow the President to address a

---

[6] Even outside of the national-security context, courts "generally defer" to the Government in "determining whether the government's ends are advanced by a regulation." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073 (9th Cir. 2006). Applying such deference, the Supreme Court has upheld speech restrictions when they are justified in numerous ways, such as with "studies and anecdotes[,]" and through "history, consensus, and 'simple common sense.' " *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quotation omitted); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508-09 (1981) (noting that even in the face of a "meager record," the Court "hesitate[d] to disagree with the accumulated, common-sense judgments of local lawmakers").

threat by, among other things, discouraging certain types of conduct and preventing transactions with specified persons, or in areas that may create leverage on those responsible for the activities of concern. *See Zarmach*, 750 F. Supp. 2d at 157-58. By sanctioning Khan, the Government is seeking to deter him from continuing to attempt to exercise jurisdiction over the personnel of the United States and its allies without consent. Thus, barring Plaintiffs from transacting with Khan, including by providing him with funds, goods, or services—including outside of his work at the ICC—is narrowly tailored to the governmental interest served by the EO. *See Teague v. Reg'l Comm'r of Customs, Region II*, 404 F.2d 441, 445 (2d Cir. 1968) ("The restriction of first amendment freedoms is only incidental to the proper general purpose of the [TWEA] regulations: restricting the dollar flow to hostile nations."); *Emergency Coal. to Defend Educational Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 13-14 (D.C. Cir. 2008) (collecting cases in which sanctions programs have been upheld against First Amendment challenges, as they are "vital," "compelling," and "justified by weighty concerns of foreign policy" (internal quotation marks omitted)).

And indeed, determining the degree to which the sanctions program is necessary to further foreign-policy and national-security interests is a judgment "Congress and the Executive are uniquely positioned to make." *Humanitarian Law Project*, 561 U.S. at 35. In those areas, "the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate." *Id*. at 34 (internal quotation marks and citation omitted). Where the political branches have concluded that particular restrictions are necessary to achieve foreign-policy and national-security goals, the First Amendment does not require courts to reject that "considered judgment." *Id*. at 36.

Plaintiffs also argue that the EO is underinclusive because it does "nothing to regulate speech that aids" the unconsented-to investigation or prosecution by other states of crimes

allegedly committed by U.S. or allied personnel. Mot. at 21. But that is a distinct concern, not within the scope of the governmental interest served by or articulated by the EO. In fact, while the EO specifies activities of the ICC that are deemed to threaten U.S. interests, there is no evidence here of similar threats from other states. And if there were, addressing them would present sensitive questions of foreign policy that would be up to the Executive Branch to address according to the specific circumstances.

Plaintiffs cite *Al Haramain Islamic Foundation v. Department of the Treasury*, Mot. at 20, which held that certain content-based prohibitions on speech were not narrowly tailored to the government's interest in fighting terrorism because there was "little evidence that the pure-speech activities proposed by [the plaintiff] on behalf of the domestic branch will aid the larger international organization's sinister purposes." 686 F.3d 965, 1001 (9th Cir. 2012). That rationale does not apply here where the only prohibition is on transacting with or for the benefit of, or dealing in the property or property interests of, the designated or blocked individual.

**2.    Plaintiffs Are Not Likely to Succeed on Their Vagueness Claim**

Plaintiffs contend that the EO is unconstitutionally vague under the Fifth Amendment because the activities prohibited by § 3—"the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person whose property and interests in property are blocked pursuant to the EO, or "the receipt of any contribution or provision of funds, goods, or services from any such person"—are undefined. Mot. at 22. But similar terms are regularly used in Executive Orders issued pursuant to IEEPA, which commonly identify broad subject matters of concern while delegating the details of implementation and enforcement to one or more administrative agencies. *See, e.g.*, Exec. Order 13,581, Blocking Property of Transnational Criminal Organizations, 76 Fed. Reg. 44,757, 44,758 (July 27, 2011), § 1(c) ("making of any contribution or provision of funds, goods, or services by, to, or for the benefit of

any person whose property and interests in property are blocked pursuant to this order" and "the receipt of any contribution or provision of funds, goods, or services from any such person"); Exec. Order 14,059, Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade, 86 Fed. Reg. 71,549, 71,551 (Dec. 17, 2021), § 5 (same).

In any event, the terms alleged by Plaintiffs to be vague each "provide a person of ordinary intelligence fair notice of what is prohibited" and the EO is not "so standardless that it authorizes or encourages discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186-87, 191 (2d Cir. 2010). The mere fact that these terms have not been defined does not make them unconstitutionally vague, as courts may look to other sources, including other statutes and case law, to determine an undefined term's meaning. *See Jordan v. De George*, 341 U.S. 223, 229-30 (1951) (upholding phrase "crime of moral turpitude" against vagueness challenge by examining meaning of term in cases and other statutes). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304.

"Services" has a commonly understood meaning and several courts have rejected vagueness challenges to "services" in other sanctions laws on that basis. *See Humanitarian Law Project*, 561 U.S. at 23-24 (holding person of ordinary intelligence would understand the meaning of "service" and citing dictionary definition); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 896 (N.D. Ohio 2009); *Kadi*, 42 F. Supp. 3d at 40-41; *United States v. Lindh*, 212 F. Supp. 2d 541, 574 (E.D. Va. 2002); *see also United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004) (executing money transfers from the U.S. to Iran violates Iran Embargo because "[t]he term 'services' is unambiguous"). Plaintiffs' concern that "services . . . for the benefit of" is particularly unclear is not well founded. A person of ordinary intelligence would understand that "services *for the benefit of*" (in contrast to

18

"services *to*") refers to the indirect provision of services. The Supreme Court's analysis of "services to" in *Humanitarian Law Project* supports this understanding. 561 U.S. at 23-24 ("The use of the word 'to' indicates a connection between the service and the foreign group" that excludes independent advocacy).

In addition, there are mechanisms available to Plaintiffs to ascertain any meanings that are unclear to them. Uncertainty of meaning is more constitutionally tolerable where an affected party has "the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); *accord Copeland v. Vance*, 893 F.3d 101, 118 (2d Cir. 2018). As noted above, OFAC has publicly stated that protected speech activity will not be the subject of sanctions, and anyone concerned about the applicability of sanctions to their activities may seek the agency's guidance. FAQ No. 1190, https://ofac.treasury.gov/faqs/1190. And preexisting regulations allow Plaintiffs and others to seek a license from OFAC authorizing specific conduct (although no such license is needed for constitutionally protected activity, or activity that is otherwise exempt under, for instance, the Berman Amendment). *See supra* n.5.

**3.    Plaintiffs Are Not Likely to Succeed on Their "*Ultra Vires*" Claim**

Plaintiffs' argument that the EO violates IEEPA also fails because Plaintiffs have no entitlement to assert such a claim, and because the EO is consistent with the statute.

First, IEEPA contains no private right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). IEEPA does not contain the sort of "rights-creating language" that courts find "critical" to imputing to Congress an intent to create a private right of action. *Id.* at 288-89. Because IEEPA does not "explicitly confer[] [any] right directly on"

individuals affected by an IEEPA Executive Order, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979), but instead contains provisions that are at most "phrased as a directive" to the Executive Branch*, see Sandoval*, 532 U.S. at 289, no private right of action exists to enforce the statute's provisions.[7]

 Similarly, Plaintiffs cannot obtain relief against the President for his actions in connection with the EO. Federal courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03, 806 (1992) (plurality op.). And separation-of-powers concerns mandate that an "express statement by Congress" is required before even a generally available cause of action may be extended specifically to challenge an action of the President. *See Franklin*, 505 U.S. at 801; *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982).

 Second, even if Plaintiffs could bring an *ultra vires* claim, it would fail. The Berman Amendment, 50 U.S.C. § 1702(b)(3), exempts from the President's authority under IEEPA the power to regulate or prohibit the importation from any country or exportation to any country of information or informational materials. Plaintiffs argue that because the EO "omits any reference" to this exception, it "implies" that no such exception exists. Mot. at 25-26. But that is false logic: any "implication" of this omission cannot override IEEPA's clear language. Additionally, the EO expressly provides that it "shall be implemented consistent with applicable law," which includes IEEPA. EO § 12(b). And OFAC has repeated the limitation of the Berman Amendment in its public guidance. FAQ No. 1190, https://ofac.treasury.gov/faqs/1190

---

[7] *OSJI* reasoned that Congress would not have begun § 1702(c) with the phrase "In any judicial review of a determination made under this section" if it had not contemplated a private right of action to review an exercise of authority under § 1702. 510 F. Supp. 3d at 214. But the court there disregarded the final phrase of § 1702(c): "This subsection does not confer or imply any right to judicial review."

("additional limitations and authorizations are in place to ensure that U.S. sanctions do not restrict the exchange of information or informational materials, or personal communication"). IEEPA's language is clear, and the EO clearly states that it will be implemented in accordance with its restrictions.[8] It is therefore "no more than speculation that OFAC intends to violate [§ 1702(b)(3)] in its enforcement of the Executive Order." *OSJI*, 510 F. Supp. 3d at 215-16.

In addition, Plaintiffs' claim fails because they do not specify which of their activities— widely including "education, advice, training, information, analysis, and other services," Compl. ¶ 2—that they believe may be covered by § 1702(b)(3) as "information or informational materials." Not all such activities qualify: OFAC has interpreted § 1702(b)(3) not to extend to "information or informational materials not fully created and in existence at the date of the transactions, or to the substantive or artistic alteration or enhancement of informational materials, or to the provision of marketing and business consulting services." *E.g.*, 31 C.F.R. § 560.210(c)(2) (Iranian Transactions and Sanctions Regulations).[9] That interpretation—which distinguishes between "informational materials that are widely circulated in a standardized format and those that are bespoke"—has been upheld as reasonable. *Amirnazmi*, 645 F.3d at 587-88 ("[T]here is ample evidence to suggest Congress has accepted OFAC's decision to permit the circulation of informational materials already in existence while concomitantly regulating transactions that contemplate the creation of new materials."); *accord Capital Cities/ABC, Inc. v.*

---

[8] Plaintiffs distinguish *OSJI*, which held the *ultra vires* claim not to be ripe, by asserting that the Government has failed to acknowledge the clarity of IEEPA's language or the EO's statement that it is to be implemented in accordance with law. To the extent such an acknowledgment is necessary, and was not already provided in OFAC's FAQ, it is provided here.

[9] The same language appears in numerous other sanctions regulations. *E.g.*, 31 C.F.R. §§ 582.205(b)(2), 569.205(b)(2), 547.206(c)(2), 549.206(b)(2), 548.206(b)(2), 579.205(b)(2), 544.206(b)(2), 576.209(b)(2), 536.205(b)(2), 510.213(c)(2), 542.211(c)(2), 539.204(b)(2), 515.206(a)(2).

*Brady*, 740 F. Supp. 1007, 1011-13 (S.D.N.Y. 1990). OFAC's interpretation is consistent with the list of examples of "informational materials" in § 1702(b)(3)—"publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feed"—all embodiments of information in fixed form. It is also consistent with the legislative intent of the Berman Amendment. *Amirnazmi*, 645 F.3d at 587.

Plaintiffs' unspecified as-applied challenge thus fails to the extent § 1702(b)(3) does not apply to their described actions—for instance, any interactive and dynamic "training" or "education," rather than fixed, standardized forms of information. *See Amirnazmi*, 645 F.3d at 587.

## C. Plaintiffs Do Not Meet the Remaining Requirements to Establish Entitlement to Injunctive Relief

Plaintiffs also have not made a "clear showing," *Winter*, 555 U.S. at 22, that they meet the remaining requirements for injunctive relief. Plaintiffs' argument that they have demonstrated irreparable harm depends entirely on their demonstrating a clear likelihood of success on the merits of their First Amendment claim which, for the reasons discussed above, they cannot do. *See N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.").

Additionally, the balance of the equities and the public interest favor the Government. At stake here are significant national-security and foreign-policy interests that weigh strongly against an injunction. *See Winter*, 555 U.S. at 24; *cf. United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002). The injunction Plaintiffs seek would frustrate and displace the President's determination of how best to address threats to national security. *Milena Ship Mgmt. Co. v.*

*Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992) (holding that injunction "unblocking the plaintiffs' vessels and bank accounts . . . would risk impermissible interference with Executive and Congressional decisions").

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:    New York, New York
          May 13, 2025

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney for the
                                        Southern District of New York

                              By:    /s/ *Alyssa B. O'Gallagher*
                                        ALYSSA B. O'GALLAGHER
                                        BENJAMIN H. TORRANCE
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Telephone: (212) 637-2822/2703
                                        alyssa.o'gallagher@usdoj.gov
                                        benjamin.torrance@usdoj.gov
                                        *Counsel for Defendants*

### Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7226 words.