UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                     :

GABOR RONA et al.,                          :

                        Plaintiffs,          :

                                                     :          25-CV-3114 (JMF)

               -v-                       :

                                                   :         <u>OPINION AND ORDER</u>

DONALD J. TRUMP et al.,              :

                                               :

                        Defendants.      :

                                               :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In law, as in life, two wrongs do not make a right.  In 2020, during his first administration,

President Donald J. Trump issued an Executive Order (the "2020 Order") imposing sanctions on

certain persons associated with the International Criminal Court ("ICC") and subjecting people who

provide services to those designated persons to civil and criminal penalties.  A group of plaintiffs —

including Gabor Rona, a law professor — brought suit in this District arguing, among other things,

that the 2020 Order violated the First Amendment.  The Honorable Katherine Polk Failla concluded

that the plaintiffs in that suit were likely to succeed on the merits of that claim and preliminarily

enjoined the Government from enforcing the 2020 Order against the plaintiffs.  *See Open Soc'y*

*Justice Initiative v. Trump*, 510 F. Supp. 3d 198, 209-13, 217 (2021).  The Government did not

appeal Judge Failla's ruling, and the case was voluntarily dismissed after President Joseph R. Biden

revoked the 2020 Order in 2021.  *See* No. 20-CV-8121 (KPF), ECF No. 68.

      Upon his return to office in 2025, President Trump issued Executive Order 14,203 (the

"2025 Order"), which is substantially similar to the Order that Judge Failla enjoined over four years

ago; in fact, it includes the *exact* language that she found likely unconstitutional.  Rona, joined by

another law professor, Lisa Davis, then filed this action, which challenges the 2025 Order on the

same grounds that she and her co-plaintiffs asserted in the earlier action, *see* ECF No. 23 ("Compl."), and thereafter moved to preliminarily enjoin the Government from enforcing the 2025 Order against them, *see* ECF No. 16.  Because the facts are undisputed and the issues are purely ones of law, the Court proposed, and the parties ultimately agreed to, consolidation of Plaintiffs' motion for a preliminary injunction with adjudication of the merits.  *See* ECF Nos. 58, 68; *see also* Fed. R. Civ. P. 65(a)(2); *Citibank, N.A. v. Brigade Cap. Mgmt., LP*, 49 F.4th 42, 57 & n.9 (2d Cir. 2022).  The Court therefore exercises its discretion to consolidate the preliminary injunction hearing with trial on the merits and, thus, treats Plaintiffs' request for a preliminary injunction as a request for a ruling on the merits and for a permanent injunction.

On the merits, the Court concludes that the 2025 Order violates Plaintiffs' First Amendment rights because it constitutes a content-based regulation of their speech-based activities and cannot survive strict scrutiny.  Accordingly, and for the reasons elaborated below, Plaintiffs' motion is GRANTED, and they are entitled to a permanent injunction.

## BACKGROUND

### A.  The 2020 Order

This case concerns sanctions imposed by the Government on designated persons associated with the ICC.  The ICC is a permanent court based in the Hague, which was established by the Rome Statute, an international treaty to which 125 countries — but not the United States — are party.  Compl. ¶ 32.  The ICC exercises jurisdiction over the investigation and prosecution of people accused of international crimes such as war crimes and crimes against humanity.  *Id.* ¶ 33.  States that ratify or accede to the Rome Statute consent to the investigation and prosecution of crimes within the ICC's jurisdiction alleged to have occurred on their territory or by their nationals.  *Id.* ¶ 34.  Within the ICC, the Office of the Prosecutor ("OTP") is responsible for investigating and prosecuting people allegedly responsible for committing crimes within its jurisdiction.  *Id.* ¶ 36.

On June 11, 2020, President Trump issued the 2020 Order and its initial implementing regulations pursuant to his authority under the International Economic Emergency Powers Act ("IEEPA").   Exec. Order No. 13,928, Blocking Property of Certain Persons Associated with the International Criminal Court, 85 Fed. Reg. 36,139 (June 11, 2020); *see also Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 201-02.  The Order — titled *Blocking Property of Certain Persons Associated with the International Criminal Court* — was issued in the wake of an investigation conducted by the then-Prosecutor of the ICC, Fatou Bensouda, of certain crimes allegedly committed by the Taliban, Afghan security forces, and U.S. and allied personnel in Afghanistan. *See Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 201-02.  The Order declared a national emergency with respect to "any attempt by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States, or of personnel of countries that are United States allies and who are not parties to the Rome Statute or have not otherwise consented to ICC jurisdiction."  Exec. Order No. 13,928, 85 Fed. Reg. 36139.  Section 1(a)(i) of the Order restricted transfer of property and interests in property that are in the United States, or that come within the possession or control of any United States persons, to any designated person "to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute any United States personnel without the consent of the United States."  *Id.*  Section 3(a) of the Order specified that this restriction included "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person" designated pursuant to the Order.  *Id.*

Because the 2020 Order was issued pursuant to IEEPA, any person who violated the Order was potentially subject to IEEPA's civil and criminal penalties.  IEEPA grants the President certain powers upon his declaration of a national emergency under the National Emergency Act, 50 U.S.C. §§ 1601 *et seq.*, with respect to "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of

the United States."  50 U.S.C. § 1701(a).  When the President declares such an emergency, the President may "block . . . , regulate, . . . void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, . . . dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  *Id.* § 1702(a)(1)(B).  Persons designated under IEEPA are placed on the Specially Designated Nationals and Blocked Persons List ("SDN List"), which is maintained by the Office of Foreign Assets Control ("OFAC").  Compl. ¶ 60.  Anyone who interacts with a designated person in a prohibited manner is subject to penalties under IEEPA, which today include civil fines in an amount equal to the greater of $377,700 or twice the value of a violative transaction, and criminal penalties in the form of a fine of up to $1,000,000 and (for a natural person) up to twenty years' imprisonment.  50 U.S.C. § 1705; *see* 90 F.R. 3687-01 (2025).

In September 2020, then-Secretary of State Michael R. Pompeo designated Bensouda and Phakiso Mochochoko, another official in the OTP, as persons subject to the sanctions provided by the 2020 Order.  *See Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 204-05.  As a result, anyone who engaged in prohibited interactions with Bensouda and Mochochoko was potentially subject to IEEPA's civil and criminal penalties.  *See id.*

**B.  *Open Society Justice Initiative v. Trump***

In October 2020, Rona, three other law professors, and a public interest law center filed a lawsuit in this District challenging the 2020 Order.  *See id.* at 202.  Each of the plaintiffs in that action had previously supported the ICC's OTP in various capacities, whether by submitting *amicus* briefs in support of a position taken by the OTP or by providing direct support to the OTP in the form of trainings or formal advising.  *See id.* at 205-07.  The plaintiffs alleged that their continued provision of services to the OTP would subject them to civil and criminal penalties under IEEPA.

*Id.* at 202.  In particular, the plaintiffs alleged that several of their speech activities rendered them vulnerable to IEEPA penalties, including "participating in meetings with members of the [OTP], including Ms. Bensouda and Mr. Mochochoko . . . ; providing presentations, advice, and training to benefit members of the [OTP]; conducting and supervising research in support of the [OTP]; and submitting *amicus curiae* briefs supportive of the [OTP]." *Id.* at 210.  The plaintiffs argued that the 2020 Order violated their rights under the First and Fifth Amendments to the U.S. Constitution and was *ultra vires* under IEEPA.  *Id.* at 207.  They sought, among other things, a preliminary injunction barring the Government from enforcing IEEPA's civil and criminal penalties against them.  *Id.*

Judge Failla granted the preliminary injunction motion in part, concluding that the plaintiffs were likely to succeed on the merits of their First Amendment claim.  At the outset, she agreed that the plaintiffs' "desired conduct likely qualifie[d] as 'services' that either directly or indirectly benefit Ms. Bensouda or Mr. Mochochoko," rendering them vulnerable to IEEPA penalties.  *Id.* at 210.  She next concluded that Executive Order 13,928 imposed content-based speech restrictions subject to strict scrutiny because the "[p]laintiffs' speech is restricted if, and only if, it has the function or purpose of benefitting Ms. Bensouda or Mr. Mochochoko."  *Id.* at 211.  Finally, Judge Failla determined that the Order likely could not withstand strict scrutiny because it "swe[pt] far more broadly than [wa]s necessary to address the Government's stated concern about the investigation and prosecution by the ICC of U.S. and allied personnel."  *Id.* at 212.  Judge Failla agreed with the plaintiffs that "[t]he Order . . . prohibit[ed] speech activities that benefit[ed] Ms. Bensouda or Mr. Mochochoko in any way, regardless of whether there [wa]s a nexus between that activity, or the benefit of that activity, and the [OTP's] Afghanistan investigation."  *Id.*  "As a result," she concluded, "the restrictions prohibit[ed] or chill[ed] significantly more speech than even Defendants seem[ed] to believe [wa]s necessary to achieve their end, *i.e.*, to obtain and exert

5

leverage over Ms. Bensouda and Mr. Mochochoko so as to induce them to desist from their investigation of U.S. and allied personnel." *Id.*[1]

Finding that the other preliminary injunction factors also favored the plaintiffs, Judge Failla preliminarily enjoined the Government from "enforcing IEEPA's civil or criminal penalty provisions against [the] [p]laintiffs for [their desired] conduct . . . to the extent that such conduct [wa]s alleged to have been committed in violation of Executive Order 13,928." *Id.* at 217.  The Government did not appeal.  After President Biden assumed office, he issued an Executive Order titled *Termination of Emergency with Respect to the International Criminal Court*, which rescinded the 2020 Order.  *See* Exec. Order No. 14,022, 86 Fed. Reg. 17895 (April 1, 2021).  OFAC subsequently removed Bensouda and Mochochoko from the SDN List and, in April 2021, the case before Judge Failla was voluntarily dismissed.  *See* No. 20-CV-8121 (KPF), ECF No. 68.

## C.  The 2025 Order

On the first day of his second administration, President Trump revoked Executive Order 14,022 by issuing Executive Order 14,148, titled *Initial Recissions of Harmful Executive Orders and Actions*.  *See* Exec. Order 14,148, 90 Fed. Reg. 8237 (Jan. 20, 2025).  A few weeks later, on

---

[1]    By contrast, Judge Failla concluded that the plaintiffs were unlikely to prevail on their Fifth Amendment claim and that their *ultra vires* claim was not ripe.  With respect to the former, she determined that the plaintiffs were unlikely to show that they faced "an imminent threat of designation" and, thus, unlikely to establish they had standing to challenge the Order, which applied only to the designation process, as unconstitutionally vague.  *See id.* at 213.  With respect to the latter, the plaintiffs had alleged that the 2020 Order ran afoul of IEEPA's "informational materials" exception, which prohibits the President from regulating or prohibiting, "directly or indirectly," "the importation from any country, or the exportation to any country, . . . of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."  50 U.S.C. § 1702(b)(3).  In response, the Government observed that the Order "expressly provides that it 'shall be implemented consistent with applicable law,'" which includes IEEPA's informational materials exception.  *Open Soc'y Justice Initiative* , 510 F. Supp. 3d at 215.  Judge Failla agreed, finding that it was "no more than speculation that OFAC intend[ed] to violate [the informational exception] in its enforcement of the Executive Order" at that time.  *Id.* at 215-16.

February 6, 2025, President Trump followed with the 2025 Order, which imposes sanctions against persons who provide certain forms of aid to the ICC or persons designated under the Order.  Compl. ¶ 71; Exec. Order No. 14,203, 90 Fed. Reg. 9369 (Feb. 6, 2025).

The 2025 Order is thus the successor to the 2020 Order.  It declares a national emergency with respect to "any effort by the ICC to investigate, arrest, detain, or prosecute" any U.S. personnel without the consent of the United States, or personnel of countries that are U.S. allies and who are not parties to the Rome Statute, or personnel of countries that have not otherwise consented to ICC jurisdiction.  Exec. Order No. 14,203, 90 Fed. Reg. 9370.  In particular, it refers to the warrants issued for the arrests of "Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant" as "baseless," *id.* at 9369, and it designates Karim Khan — the current Prosecutor of the ICC and head of the OTP — for sanctions, *id.* at 9373.[2]  On February 13, 2025, OFAC added Khan to the SDN List.  *See* Compl. ¶ 72.

Section 3(a) of the 2025 Order is identical to Section 3(a) of the 2020 Order.  As its predecessor did, the 2025 Order prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order."  Exec. Order No. 14,203, 90 Fed. Reg. 9370.  It does not define "services to or in support of" or "services by, to, or for the benefit of."  *See generally id.*  And the Government has not issued any regulations interpreting those terms.

---

[2]    Since this case was filed, Khan took leave from his role as the ICC's chief prosecutor.  *See* Sofia Ferreira Santos, *ICC Prosecutor Steps Aside Until Sexual Misconduct Probe Ends*, BBC (May 16, 2025), https://www.bbc.com/news/articles/cgeg738rvdeo [https://perma.cc/A4L9-S2E4]. Neither side has suggested, however, that this development has any impact on the claims at issue here.

**D. This Lawsuit**

Rona and Davis, both law professors, commenced this action on April 15, 2025. ECF No. 1. Prior to the issuance of the 2025 Order, they had provided education, training, analysis, and other services to Khan and others in the OTP. Compl. ¶ 2. Rona's ICC-related work included submitting an *amicus curiae* brief to the ICC in support of an OPT position; contributing to online journals and blogs about international criminal law to support positions adopted by the OTP; speaking on panels in support of the OTP; discussing ongoing investigations by the OTP in law school courses he taught; and communicating with the OTP to facilitate placement of students in jobs and internships in positions that support the ICC's prosecutions. *See* ECF No. 18 ("Rona Decl."), ¶¶ 9-13. Davis's ICC-related work included drafting the OPT's *Policy on the Crime of Gender Persecution*; providing guidance to OTP teams regarding investigating, charging, and prosecuting crimes that may amount to gender persecution; training investigators, analysts, and prosecutors within the OPT; serving on the Advisory Committees for the OTP's *Sexual and Gender-Based Crimes Policy* and its *Policy on Children*; presenting training for domestic prosecutors and judges concerning situations under investigation by the OTP; and contributing to the development of an external support base for the OTP's work. *See* ECF No. 19 ("Davis Decl."), ¶¶ 7-23.

Rona and Davis allege that they "have been injured, and continue to be injured, by the threat of enforcement of IEEPA's civil and criminal penalties for providing services to or for the benefit of Mr. Khan," which has "caus[ed] [them] to discontinue speech they were previously engaging in and caus[ed] them to abandon or reconsider speech they had planned to perform before the Executive Order was issued." Compl. ¶ 76. Davis, for instance, has "stopped interacting with, and providing advice to, Mr. Khan and the [OTP] on matters related to gender and other discriminatory crimes in all situations under the ICC's jurisdiction"; "stopped advising Mr. Khan and the [OTP] about applications for arrest warrants related to gender and other discriminatory crimes"; "ceased

liaising with victims and witnesses of international crimes for the purpose of supporting ongoing investigations by the [OTP]"; stopped drafting policy papers or pursuing paper proposals related to "gender and other discriminatory crimes"; refrained from "conven[ing] expert panel workshops with the relevant employees and Special Advisors of the [OTP]"; and "withdrawn a pending publication, cancelled participation in a relevant podcast, and declined other writing opportunities concerning the Prosecutor's work." *Id.* ¶¶ 78-84. Rona has "abandoned plans to submit *amicus curiae* briefs supportive of the [OTP]"; "abandoned plans to write blog posts and articles on areas of his expertise relating to the work of the ICC, including on topics he had previously written about, such as ongoing investigations by the [OTP]"; "discontinued communications with the [OTP] concerning the placement of students in jobs and internships to assist ICC prosecutions"; and broadly "no longer expresses certain opinions about the ICC's role" in his "courses, speaking engagements, and scholarship." *Id.* ¶¶ 86-89. Rona and Davis allege that they have discontinued these activities even though they "would have involved speech concerning situations that do not fall within the purported national emergency described in" the 2025 Order. *Id.* ¶¶ 85, 90.

Based on these allegations, Rona and Davis bring claims under the First and Fifth Amendments to the U.S. Constitution. *Id.* ¶¶ 92-95. Specifically, they allege that the 2025 Order "violates the First Amendment by barring Plaintiffs from engaging in speech to support the ICC's [OTP], including the Prosecutor, and by subjecting Plaintiffs to the prospect of civil or criminal penalties for engaging in that speech," *id.* ¶ 93, and that the 2025 Order's "term 'services by, to, or for the benefit of' violates the Fifth Amendment because it provides no notice to Plaintiffs as to what acts are prohibited and permits arbitrary enforcement of the Executive Order," *id.* ¶ 95. The Complaint also asserts an *ultra vires* claim, alleging that the 2025 Order runs afoul of IEEPA's informational materials exception because "it regulates or prohibits, and authorizes Defendants to

regulate or prohibit, acts" that "include the importation and/or exportation of 'information or informational materials' within the meaning of IEEPA." *Id.* ¶¶ 98-99.

On April 15, 2025, Plaintiffs also moved for a preliminary injunction that would "enjoin Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs under EO 14,203." ECF No. 17 ("Pls.' Mem."), at 28. The Court proposed consolidating the preliminary injunction motion with trial on the merits, *see* ECF No. 63, but reserved judgment on the question pending the anticipated publication of OFAC regulations implementing the 2025 Order, *see* ECF No. 65. On July 1, 2025, OFAC published implementing regulations for the 2025 Order, *see* 31 C.F.R. Part 528, 90 Fed. Reg. 28012 ("Regulations"), which expressly incorporated IEEPA's informational materials exception, 31 C.F.R. § 528.205(a) ("The prohibitions contained in this part do not apply to any transactions that are exempt pursuant to section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b))."). Based on that express incorporation, Plaintiffs have abandoned their *ultra vires* claim. *See* ECF No. 68 ("Joint Letter"), at 4. And in light of the publication of implementing regulations, the Government consented to consolidation of Plaintiffs' motion for a preliminary injunction with adjudication on the merits. *Id.* at 3.

## DISCUSSION

Having consolidated the preliminary injunction motion with adjudication on the merits, the Court treats Plaintiffs' request for a preliminary injunction as a request for a permanent injunction. A party "requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2012). "Thus, the standard for a permanent injunction is essentially the same as for a preliminary injunction, the difference being that the plaintiff must show actual success rather than a likelihood of success." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 889 F. Supp. 2d 606, 611 (S.D.N.Y. 2012) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)).

Because Defendants concede that the irreparable harm factor "depends entirely" on Plaintiffs'
demonstration of their success on the merits, ECF No. 56 ("Defs.' Opp'n"), at 22, the Court begins
its analysis with the merits factor.

**A.  Actual Success on the Merits**

As an initial matter, the Court rejects Plaintiffs' argument, raised for the first time in their
reply memorandum of law, *see* ECF No. 59 ("Pls.' Reply"), at 6 & n.7, that they bring a facial — as
opposed to an as-applied — challenge against the 2025 Order.  By their plain terms, Plaintiffs'
Complaint and request for injunctive relief seek invalidation of the 2025 Order only as to Plaintiffs:
The Complaint seeks an order "enjoin[ing] Defendants from enforcing IEEPA's civil and criminal
penalties against *them*," Compl. Prayer for Relief ¶ A (emphasis added), and the request for
injunctive relief requests that the Court "enjoin Defendants from enforcing IEEPA's civil and
criminal penalties against *Plaintiffs* under EO 14,203," Pls' Mem. 28 (emphasis added).  It is well
established that arguments raised for the first time on reply are forfeited.  *See, e.g.*, *Prospect Capital
Corp. v. Credito Real USA Finance LLC*, 702 F. Supp. 3d 178, 190 n.6 (S.D.N.Y. 2023).  What is
more, "[f]acial challenges are disfavored" because "[c]laims of facial invalidity often rest on
speculation" and "run contrary to the fundamental principle of judicial restraint that courts should
neither anticipate a question of constitutional law in advance of the necessity of deciding it nor
formulate a rule of constitutional law broader than is required by the precise facts to which it is to
be applied."  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-
51 (2008) (cleaned up).  For that reason, "the 'normal rule' is that 'partial, rather than facial,
invalidation is the required course,' such that a 'statute may . . . be declared invalid to the extent that
it reaches too far, but otherwise left intact.'"  *Ayotte v. Planned Parenthood of Northern New Eng.*,
546 U.S. 320, 329 (2006) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Accordingly, the Court limits its inquiry to whether the 2025 Order survives First Amendment scrutiny as applied to Plaintiffs' desired speech activities.

The First Amendment prohibits the Government from taking actions abridging free speech. In evaluating whether a regulation runs afoul of that prohibition, courts have long distinguished between regulations that are content based and regulations that are content neutral.  Content-based laws are "those that target speech based on its communicative content."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  They are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Id*.  By contrast, a content-neutral regulation "serves purposes unrelated to the content of expression . . . , even if it has an incidental effect on some speakers or messages but not others."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Such regulations "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (citation omitted).  Under that standard, a content-neutral law survives "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."  *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

In evaluating whether the 2025 Order is content based or content neutral, the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), is instructive.  *Holder* involved a First Amendment challenge to 18 U.S.C. § 2339B (also known as the material-support statute), which prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization."  18 U.S.C. § 2339B(a)(1).  The plaintiffs argued that Section 2339B violated their First Amendment rights insofar as it prohibited them from providing "training," "expert advice or assistance," "service," and "personnel" to members of designated terrorist groups.  *Holder*, 561 U.S.

12

at 14.  Specifically, they claimed that the statute was invalid to the extent that it prohibited them from engaging in several speech-related activities, including training members of the designated groups in international law or teaching members about using representative bodies such as the United Nations for relief.  *See id.* at 14-15.  The Supreme Court ultimately rejected the plaintiffs' challenge to Section 2339B, but not before holding that the statute was content-based and, thus, subject to strict scrutiny.  *Id.* at 38-39.  The plaintiffs, the Court explained, "want to speak to [the designated terrorist groups], and whether they may do so under § 2339B depends on what they say. If [the] plaintiffs' speech to those groups imparts a 'specific skill' or communicates advice derived from 'specialized knowledge' — for example, training on the use of international law or advice on petitioning the United Nations — then it is barred.  On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge."  *Id.* at 27 (citation omitted).  In reaching that conclusion, the Court also rejected the Government's suggestion that Section 2339B should receive intermediate scrutiny because "material support" for terrorism "most often does not take the form of speech at all" and the law therefore "*generally* functions as a regulation of conduct."  *Id.* at 26-28.  Citing its seminal decision in *Cohen v. California*, 403 U.S. 15 (1971), the Court explained that "more rigorous scrutiny" is appropriate where a "generally applicable regulation of conduct" is enforced against a speaker "because of what his speech communicated." *Id.* at 27-28.

*Holder* compels the conclusion that the 2025 Order is content based because, like Section 2339B, the Order "regulate[s] speech based on its function or purpose."  *Tiktok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025) (citing *Holder*, 561 U.S. at 7, 27); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022) ("[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result.").  For starters, the Order plainly

regulates Plaintiffs' speech.  Plaintiffs seek, for example, to "advis[e] Mr. Khan and the [OTP] about applications for arrest warrants related to gender and other discriminatory crimes," to "liais[e] with victims and witnesses of international crimes for the purpose of supporting ongoing investigations by the [OTP]," to "submit *amicus curiae* briefs supportive of the [OTP]," and to "communicat[e] with the [OTP] concerning the placement of students in jobs and internships to assist ICC prosecutions."  Compl. ¶¶ 79, 80, 86, 88.  These actions are indisputably speech and fall comfortably within the broad scope of the 2025 Order's prohibition on "the making of *any* . . . services by, to, or for the benefit of" designated persons like Khan.  Exec. Order No. 14,203, 90 Fed. Reg. 9370 (emphasis added); *see Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 210 (holding that similar conduct "likely qualifie[d] as 'services' that either directly or indirectly benefit[ed]" the OTP).  And yet, whether Plaintiffs may engage in such speech "depends on what they say."  *Holder*, 561 U.S. at 27.  Plaintiffs are free to speak if their speech does not have the function or purpose of benefitting Khan; but they are subject to civil and criminal penalties if it does have that function or purpose.  In other words, "Plaintiffs' speech is restricted if, and only if, it has the function or purpose of benefitting [Khan]."  *Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 211.  The 2025 Order is thus content based.[3]

The Government's rejoinders on this front are unpersuasive.  Its primary response is that the 2025 Order does not regulate protected speech.  *See* Defs.' Opp'n 12.  Its support for that statement?  An excerpt from the OFAC website's *Frequently Asked Questions* page stating that

---

[3]    Given that the 2025 Order regulates speech based on its function or purpose, the Government's assertion that the Order was "adopted to address the Government's national-security concerns, not because of a disagreement with a certain message," Def.'s Opp'n 13, is irrelevant.  As discussed, regulation of speech based on its function or purpose is, on its own, enough to trigger strict scrutiny.  *See Reed*, 576 U.S. at 163-64.  For that reason — and because the Court ultimately finds that the 2025 Order cannot survive strict scrutiny — the Court need not and does not reach Plaintiffs' argument that the 2025 Order discriminates on the basis of viewpoint (and is, thus, even more constitutionally suspect).  *See* Pls.' Mem. 16-17.

"OFAC does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech" and that persons "concerned that potential sanctions may interfere with constitutionally protected activities" should "reach out to OFAC for further guidance." *Id.* (citing *Basic Information on OFAC and Sanctions*, OFAC (Aug. 27, 2024), https://ofac.treasury.gov/faqs/1190 [https://perma.cc/JVY6-DTX2]).  But that statement pre-dates the 2025 Order.  And regardless, Plaintiffs' First Amendment rights cannot be defeated by the Government's professions of good will.  Indeed, in *United States v. Stevens*, 559 U.S. 460, 480 (2010), the Government vigorously declared that it enforced the statute at issue narrowly so as not to sweep in any protected expression, but the Supreme Court was unmoved by its assurances. "[T]he First Amendment," the Court declared, "protects against the Government; it does not leave us at the mercy of *noblesse oblige*.  We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.*  Just so here.

Even so, the Government insists that its "reasonable interpretation of [the] Executive Order, even if it is not the only one permitted by the language of the Order, is entitled to courts' respect." Defs.' Opp'n 13 (internal quotation marks omitted).  The problem is that the Government does not even bother to explain why its interpretation of the Order's language is "reasonable."  Indeed, reference to the Order's text is altogether missing from the Government's brief.  Instead, aside from OFAC's webpage, the Government cites a November 2024 letter from the then-Acting Director of OFAC stating that inviting a sanctioned individual to speak at a conference "is not a service prohibited by U.S. sanctions." *Id.* at 12.  But that letter also pre-dates the 2025 Order and thus obviously does not interpret the Order's terms.  Moreover, it does not speak to the speech-based activity in which Plaintiffs here wish to engage.  (Indeed, neither Plaintiff in this case has expressed a desire to invite Khan to a conference).

Nor does IEEPA's informational materials exception support the Government's reading. The Government notes in passing that its reading is consistent with IEEPA's informational materials exception, which the OFAC regulations have since incorporated. *See id.*; Regulations § 528.205(a). But the fact that the 2025 Order does not regulate the transmission of "information" within the meaning of IEEPA does not lend support to the Government's broader position that the Order regulates no protected speech at all. For one thing, on the same page of its brief, the Government itself concedes that the 2025 Order may prohibit the transmission of an *amicus curiae* brief if that brief "was drafted at the specific request of and in coordination with Khan." Defs.' Opp'n 12. In other words, even the Government acknowledges (1) that there is daylight between the conduct exempted by IEEPA's informational materials exception and the speech-based activity regulated by the 2025 Order and (2) that the latter may regulate some protected speech. The Government also expressly adopts the position that it took in the litigation before Judge Failla: that Rona and Davis's desired speech activity is not covered by the informational materials exception. Writing in response to Plaintiffs' *ultra vires* claim, the Government argues that "[n]ot all" of Plaintiffs' desired activity "qualify" as "information or informational materials." *Id.* at 21. That is because, according to the Government, IEEPA's exception applies only to "informational materials that are widely circulated in a standardized format" and not to "those that are bespoke." *Id.* The exception thus does not cover Rona and Davis's described actions, which include "interactive and dynamic 'training' or 'education,' rather than fixed, standardized forms of information." *Id.* at 22.

In short, the 2025 Order regulates protected speech based on content.[4] It is thus "presumptively unconstitutional and may be justified only if the government proves that [it is]

---

[4]    Plaintiffs argue that the 2025 Order discriminates not only on the basis of content but on the basis of viewpoint and is, thus, even more constitutionally suspect. *See* Pls.' Mem. 16-17. The Court need not and does not reach that question.

narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "In order for [the Government] to show that [the Order] is narrowly tailored, [it] must demonstrate that it does not 'unnecessarily circumscrib[e] protected expression." *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002) (quoting *Brown v. Hartlage*, 456 U.S. 45, 54 (1982)). The Government cannot do so here. It argues that the Order serves its interests in "national security and foreign affairs" by "protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies." Defs.' Opp'n 14. There is no question that "[p]rotection of the foreign policy of the United States is a governmental interest of great importance." *Haig v. Agee*, 453 U.S. 280, 307 (1981). But the Supreme Court's "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role" and that courts "do not defer to the Government's reading of the First Amendment, even when such interests are at stake." *Holder*, 561 U.S. at 34. After all, "national-security concerns must not become a talisman used to ward off inconvenient claims — a 'label' used to 'cover a multitude of sins.'" *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)).

The Government's national security argument does not withstand strict scrutiny because it is overinclusive. In the Government's words, "[b]y sanctioning Khan, the Government is seeking to deter him from continuing to attempt to exercise jurisdiction over the personnel of the United States and its allies without consent." Defs.' Opp'n 16. But it is undisputed that Plaintiffs want to engage in speech that is unrelated to the Government's interest in shielding protected persons from ICC prosecution. In fact, the terms of the Order seemingly bar Plaintiffs from providing speech-based services even in connection with ICC prosecutions that the United States purportedly supports. Plaintiffs cite, for example, speech-based services to assist the ICC's investigative and prosecutorial work in Ukraine, the Democratic Republic of Congo, the Central African Republic, Sudan, Libya,

and Mali — work that has previously enjoyed the support of the United States. *See* Pls.' Mem. 19; *see also* Compl. ¶¶ 39-52 (describing in detail the "[i]nvestigations and prosecutions undertaken by the ICC's [OTP] — many of which the United States has supported"); Pls.' Reply 4.

The Government does not dispute any of this. Instead, it argues that "barring Plaintiffs from transacting with Khan, including by providing him with funds, good, or services — including outside of his work at the ICC — is narrowly tailored to the governmental interest served by" the 2025 Order because broad sanctions authorities "allow the President to address a threat by . . . discouraging certain types of conduct and preventing transactions with specified persons, or in areas that may create leverage on those responsible for the activities of concern." Defs.' Opp'n 15-16. But that argument proves too much. It would impose *no limits* on the President's authority to sanction protected speech activity to "discourag[e] certain types of conduct." *Id.* Moreover, even accepting the Government's claim that restricting Plaintiffs' speech-based services could "create leverage" and exert pressure on OTP decision-making, "this only suggests that the restrictions are a *means* for furthering Defendants' goal, not that there is no 'less restrictive alternative,' nor that the restrictions do not 'burden substantially more speech than necessary.'" Pls.' Reply 5 (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 817 (2000), and *Holder*, 561 U.S. at 27).[5]

To be sure, "when it comes to collecting evidence and drawing factual inference in [the area of national security and foreign relations], the lack of competence on the part of the courts is marked and respect for the Government's conclusions is appropriate." *Holder*, 561 U.S. at 34 (cleaned up). In *Holder*, for instance, the Court endorsed the Government's national security argument to uphold the material-support statute under strict scrutiny, agreeing that "all contributions

---

[5]    Indeed, Judge Failla concluded that "[e]ven if the Court applied intermediate scrutiny rather than strict scrutiny, [the] [p]laintiffs still would likely prevail because [the 2020 Order and the related regulations] burden substantially more speech than necessary." *Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 212 n.7.

to foreign terrorist organizations" — whether to support its violent or nonviolent activities — "further their terrorism." *Id.* at 33. But in doing so, the Court relied on its "own inferences drawn from the record evidence," including Congress's "specific findings," and "an affidavit stating the Executive Branch's conclusion on [the] question" and its "evaluation of the facts," all the while confirming that "the Government's authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals." *Id.* at 29, 33-34; *cf. Free Speech Coalition, Inc. v. Paxton*, No. 23-1122, 2025 WL 1773625, at *11 (June 27, 2025) ("In the First Amendment context, we have held only once that a law triggered but satisfied strict scrutiny . . . . That case involved an unusual application of strict scrutiny, since our analysis relied on the 'deference' due to the Executive's 'evaluation of the facts' in the context of 'national security and foreign affairs.'" (quoting *Holder*, 561 U.S. at 33-34)). The Government in this case, on the other hand, offers no comparable record to support its argument. Instead, urging more than mere deference, it again implores the Court to take the Government at its word and endorse a foreign policy rationale with seemingly no limiting principle and no tailoring.[6] Strict scrutiny demands more. Because the 2025 Order "unnecessarily circumscribe[es]" Plaintiffs' "protected expression," it cannot survive strict scrutiny and violates the First Amendment. *White*, 536 U.S. at 775.

Notably, the Court's conclusion on that score is consistent not only with the conclusion of Judge Failla in Rona's earlier case but also with a recent decision by the Honorable Nancy Torresen

---

[6]     Neither of the cases the Government cites on this score is instructive, *see* Defs.' Opp'n 16, because the courts in those cases applied intermediate scrutiny to uphold content-neutral currency embargoes. *See Teague v. Reg'l Comm'r of Customs, Region II*, 404 F.2d 441, 445-46 (2d Cir. 1968) (applying intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), because "[t]he restriction of first amendment freedom is only incidental"); *Emergency Coal. to Def. Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 13 (D.C. Cir. 2008) (applying intermediate scrutiny under *O'Brien* because the currency embargo at issue was "content-neutral" and not "remotely related to the suppression of free expression").

of the United States District Court for the District of Maine.  On July 18, 2025, Judge Torresen issued a preliminary injunction in another action challenging the constitutionality of the 2025 Order. *See* ECF No. 69 (attaching *Smith v. Trump*, No. 25-CV-00158 (NT), 2025 WL 2021785 (D. Me. July 18, 2025)).  Concluding that the plaintiffs in that action — two international human rights advocates — were likely to succeed on the merits of their First Amendment challenge because "the Executive Order appears to burden substantially more speech than necessary," the court enjoined the Government "from imposing civil or criminal penalties on the [p]laintiffs under Executive Order 14203 and the IEEPA based on the [p]laintiffs' provision of speech-based services to the ICC." *Smith*, 2025 WL 2021785, at *7.  Relevant here, Judge Torreson did not even reach the question of whether the Order is content-based because she concluded that "it fails even intermediate scrutiny." *Id.* at *5.  In reaching that conclusion, Judge Torreson similarly pointed to the Order's overinclusiveness, explaining that it "broadly prohibits any speech-based services that benefit the Prosecutor, regardless of whether those beneficial services relate to an ICC investigation of the United States, Israel, or another U.S. ally" and that "[t]he Government does not explain how its stated interest would be undermined — or even impacted — by the Plaintiffs' services to the OPT related to the ICC's ongoing work in Bangladesh, Myanmar, and Afghanistan." *Id.*  Put simply, the Government has not "even attempted to tailor its solution to the potential problem it perceives, such as by prohibiting services to the Prosecutor only if they relate to ICC investigations that threaten the United States or its allies." *Id.* (internal quotation marks omitted).

Accordingly, the Court concludes that Plaintiffs have succeeded in demonstrating actual success on the merits of their as-applied First Amendment claim.  It therefore need not and does not address Plaintiffs' argument that the 2025 Order also violates the Fifth Amendment.

## B.  Irreparable Harm

A finding of irreparable harm follows directly from Plaintiffs' success on the merits of their First Amendment claim.  Indeed, the Government concedes that Plaintiff's irreparable harm argument "depends entirely on their demonstrating a clear likelihood of success on the merits of their First Amendment claim."  Defs.' Opp'n 22.  That is because "[t]he loss of First Amendment freedoms unquestionably constitutes irreparable injury."  *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020) (cleaned up); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionable constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)).  And even assuming this case is one "where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech," the irreparable injury factor is satisfied because Plaintiff has "establish[ed] a causal link between the injunction sought and the alleged injury" — i.e., Plaintiffs have "articulate[d] a 'specific present objective harm or a threat of specific future harm.'"  *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003) (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)).  As Judge Failla previously explained, "[t]he prospect of enforcement under IEPPA has caused Plaintiffs not to speak, and hence forgo exercising their First Amendment rights.  Thus, enjoining Defendants from enforcing IEEPA's civil and criminal penalties against Plaintiffs would eliminate this chill and prevent irreparable harm."  *Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 216 (citations omitted).

The Government's sole irreparable harm argument is unavailing.  It points to OFAC's implementing regulations, which incorporate licensing procedures that permit people to apply for specific licenses "to engage in a transaction that otherwise would be prohibited by" the sanctions regulations.  *See OFAC Specific Licenses and Interpretive Guidance*, OFAC (last visited July 30, 2025), https://ofac.treasury.gov/ofac-license-application-page [https://perma.cc/XSC8-JR2U];

Regulations § 528.501.  The existence of these licensing procedures, the Government argues,

"undercuts [P]laintiffs' claims that they will suffer irreparable harm absent an injunction" because

they "could provide [P]laintiffs with the relief they seek without the necessity of the extraordinary

relief of an injunction."  Joint Letter 2.  That is wrong.  The Government does not take a position on

whether Rona and Davis are entitled to a license for their desired activities.  *Id.*  And "OFAC has

not opined on whether a license is necessary for plaintiffs and plaintiffs have not applied for one."

*Id.*  "[W]ithout any details as to how OFAC intends to implement a licensing scheme for this

sanctions regime, the Court cannot conclude, as Defendants suggest, that such a scheme . . .

provides an adequate safety valve."  *Open Soc'y Justice Initiative*, 510 F. Supp. 3d at 212 (citation

omitted).  That is because "[a] law requiring prior administrative approval of speech" imposes a

"prior restraint" — "the most serious and the least tolerable infringement on First Amendment

rights."  *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485-86 (2d Cir. 2007) (collecting cases).  "[T]he

prior restraint of a license, without narrow, objective, and definite standards to guide the licensing

authority, is unconstitutional."  *Id.* at 486 (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S.

147, 150-51 (1969)).  Thus, the OFAC licensing scheme on which the Government relies — and

whose enforcement standards the Government leaves unelaborated — does not cure the irreparable

harm Plaintiffs face.  If anything, the scheme exacerbates it.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' request for a permanent injunction

against all Defendants with the exception of President Trump.[7]  Specifically, those Defendants are

---

[7]    The Government argues that "Plaintiffs cannot obtain relief against the President for his actions in connection with the [Order]" because "[f]ederal courts have 'no jurisdiction . . . to enjoin the President in the performance of his official duties.'"  Defs.' Opp'n 20 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)).  The Court need not and does not address the argument, however, because Plaintiffs effectively concede in their reply that they do not seek injunctive relief against the President himself.  *See* Pls.' Reply 10 n.11 (stating that "[t]he operative decisions that pose a threat to Plaintiffs are delegated to agents of the President — namely, the other individual

enjoined from enforcing IEEPA's civil or criminal penalty provisions against Plaintiffs for the conduct specifically addressed in Plaintiff's Complaint and in this Opinion and Order, to the extent that such conduct is alleged to have been committed in violation of the 2025 Order.  No later than **August 5, 2025**, at **12:00 p.m.**, the parties shall confer and file an agreed-upon Judgment consistent with this Opinion and Order.

The Clerk of Court is directed to terminate ECF No. 16.


SO ORDERED.

Dated: July 30, 2025
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

Defendants — against whom injunctive and declaratory relief is available" and that "Plaintiffs can seek to block [the Order's] implementation by the subordinate official Defendants" (internal quotation marks omitted)).